TERMINAL REALTY CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 43766, 50762, 60596, 71157. Promulgated May 17, 1935.

*A. E. James, Esq.*, and *Ray Garrett, Esq.*, for the petitioner.
*H. D. Thomas, Esq.*, for the respondent.

### OPINION.

MURDOCK: The first question is whether or not the petitioner is entitled to any deductions during the period of the lease on account of depreciation or obsolescence of the physical properties which it owned and leased to the traction companies. The Commissioner has allowed no deductions whatever. He argues that the petitioner is not entitled to any deduction for depreciation because the lessees were required to offset by repairs and replacements any exhaustion, wear and tear which might otherwise result from the use of the property. He relies entirely upon the provision of the lease requiring the lessees to " maintain " the " property in a good and safe condition, equally as good and safe " as it was at the beginning. He cites *A. Wilhelm Co.*, 6 B. T. A. 1, and *Terre Haute Traction & Light Co.*, 24 B. T. A. 197; affirmed on this point, 67 Fed. (2d) 697.

The statutes provide for a deduction of " a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence " based

upon the cost of the property. The Supreme Court said in *United States* v. *Ludey*, 274 U. S. 295, 300–301:

The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost.

Deductions for depreciation are allowed for the purpose of restoring the cost of exhausting property over the period of its use from untaxed earnings derived from its use. The annual allowance is made pursuant to some plan for distributing the total cost of the plant over the period of its usefulness. It is to be "a reasonable allowance" with relation to the whole life period of the asset and need not be an exact measure of the actual wearing out of the property in the particular year. Under the "straight line" method it may be assumed that depreciation proceeds at some average rate based upon an estimate of the number of years that the property will probably last. Practical judgment based upon experience should be used in making the estimate. The annual allowance may be computed by dividing the cost of the property by the number of years of its estimated life. If the probable salvage value can be estimated, it should be first deducted from cost, but if it can not be reasonably estimated, adjustment may be made for it later. Some later adjustment may also be necessary to make up for errors in the estimate. A reasonable allowance is thus merely the equitable share of the expense of ultimate retirement of the plant assignable to each year.[1]

The provision of the lease upon which the Commissioner relies must be properly interpreted. It required the lessees to maintain the property; that is, it made them responsible for the upkeep, repairs, and replacements which the property might need during the period of the lease. If a part of the property wore out or broke, the lessees were required to make the necessary repairs and replacements. Buildings may be kept in a good and safe condition, equally as good and safe as they were in the beginning, for a limited time only. Experience has taught that at the end of some period of time physical properties will be worn out despite all that can be done to them in the meantime. Proper maintenance may keep them in a condition equally as good and safe as they were in the beginning almost, if not quite, up to the end of their physical life. Indeed, their life ends when they can be maintained in a good and safe condition no longer. The probable physical life of the properties in question was somewhat longer than the period of the lease. No doubt, by proper maintenance, they could be kept throughout the period of the lease in a condition equally as good and safe as they were at the beginning

---

[1] See discussion of the depreciation charge by Mr. Justice Brandeis in a dissenting opinion in *United Railways* v. *West*, 280 U. S. 234, 259, *et seq.*

of the lease. Still they were wearing out. In 1930, for example, they were no longer new. They were somewhat deteriorated from age and worn from use. Some depreciation had actually taken place. Their probable future physical life was shorter than it was at the beginning of the lease. The respondent does not contend that the lessees were required to pay cash to the lessors at the end of the lease, or at any other time, to offset this depreciation. It seems clear that the lessees were not required by the terms of the lease to replace at the end of the lease the partially worn out buildings with new ones. Thus the lessor can expect to have returned to it, at the termination of the lease, property having a probable future physical life at that time of only a few years. Must the lessor recover the entire cost of this property through deductions from income from the use of the property during those few remaining years of usefulness, or is it reasonable to spread this cost over the entire period of usefulness of the property, including the period of the lease? Since the property was actually wearing out during the period of the lease, it seems reasonable to deduct from the annual rental a proportionate part of the cost of the property. Cf. *Richmond Belt Railway Co.*, 13 B. T. A. 1291. If obsolescence were taking place, it is even more clear that the petitioner should have a deduction. Obviously no provision of the lease would save the petitioner from loss if at the end of the lease the property, though still sturdy physically, were about to become obsolete. In such case the petitioner could recover the cost of its property only through deductions from its income during the period of the lease. The petitioner is entitled to deductions for depreciation, including obsolescence, for the years for which it has claimed deductions in its pleading and to the extent that it has proven facts from which the amount of such deductions can be determined.

The two cases cited by the respondent are distinguishable on their facts from the present case. The A. Wilhelm Co. leased its entire plant and assets as a going concern, subject to its liabilities, for a five-year period, with an option to purchase at a fixed price. The lessee was required to maintain the plant and to pay all costs of new construction. Furthermore, it was required at the expiration of the lease to return the property to the lessor in the same condition and equal in book value and actual value to its value at the beginning of the lease. A deduction for depreciation was denied the lessor during the term of the lease because " no allowance could be justified as reasonable under the circumstances." In the *Terre Haute Electric Co.* case the lease was for a period of 999 years, during which time the lessee was to maintain the property. There was to be an appraisal at the beginning, as well as at the termination, of the lease and the value of the lessor's property at the time the lease was exe-

cuted was to be restored to it at the time the lease expired. Likewise the case of *Atlantic Coast Line Railway Co.*, 31 B. T. A. 730, is distinguishable from the present case by a difference in the facts. The lease there was for a term of 999 years. The lessees were to maintain the property and at the end of the lease to return it to the lessors in good order and condition, " ordinary wear and tear excepted." The lessor's claim for a deduction for depreciation in that case seems to have been an afterthought. The Board disallowed it, stating that any loss which the lessor might expect because of the excepted " ordinary wear and tear " had neither been alleged nor shown.

The next question is to determine from the evidence the amount of the deductions. The proof in regard to the probable physical life of the properties is clear enough and is not seriously assailed by the respondent. The property would probably have no salvage value. Likewise, it is fairly well established that a period of obsolescence began about the beginning of the year 1928. The indications then were that the property would probably lose its usefulness prior to the end of its physical life. However, the period of obsolescence is not so clearly established by the evidence. One witness testified that in 1927 or early in 1928 he became convinced from the rapid decline in business of the traction companies, caused by the increased use of automobiles and trucks, that within ten or fifteen years the terminal facilities would have lost their usefulness. In addition to the testimony of this witness there is evidence of the decline in earnings of some of the companies, evidence of the abandonment of some of the lines, evidence of bankruptcy of some of the companies, and perhaps some other evidence bearing upon the subject. If the opinion of this witness were absolutely binding, then the holding would have to be that the period of obsolescence began at the beginning of 1928 and would end not later than the beginning of 1943. However, some of the other evidence indicates a slightly longer period of obsolescence. The property had been leased until 1946 and the lessees would be liable for the rental until that time. Although there were some changes in some of the companies, there was no evidence of any of them having defaulted up to the time of trial. Taking into consideration all of the evidence, we hold that the period of obsolescence began in 1928 and will end in 1946. Thus one eighteenth of the cost of the property depreciated to January 1, 1928, should be allowed as a deduction for exhaustion, wear, and tear, including obsolescence for each of the years 1928, 1929, and 1930.

The next question is whether or not the portion of the rental fixed at the amount necessary to retire the preferred stock is income to the petitioner or a capital contribution. The petitioner claims that this item was not truly rental and was not income, but instead was a capital contribution representing the payments which the lessees

were making for their common stock. The lessees were also the common stockholders. They paid no cash for stock in 1923. The petitioner points to statements in the articles of incorporation and in the resolution accepting the lease relating to how the value of the common stock was to be paid into capital account, to the fact that the total paid was apportioned and billed to the lessee companies not in proportion to their use of the terminal facilities, but in proportion to the amount of common stock held by each lessee, and to the method of accounting for these items employed by the lessor and lessee companies. It therefore argues that, despite the name which was given to the item, the parties have shown by their action that it was capital and not income to the lessor. It says that the case of *Paducah & Illinois R.R. Co.*, 2 B. T. A. 1001 is in point and controlling. However, the facts in that case were materially different. The agreement in that case provided that whenever the railway companies should make any payments to the bridge company to reduce the principal of the bonds of the bridge company then the bridge company should issue its preferred stock to the railroad companies equal in par value to the par value of the bonds retired. Those payments were not called rental. The differences in the facts serve to distinguish the two cases. This case must be decided upon its own facts.

The name which the parties gave to this item, while not controlling, is nevertheless important. They always called it rental. Furthermore, there was nothing about the payments themselves which would show that they were not rental. The single fact that they were apportioned in accordance with stockholdings rather than in accordance with the use of the facilities is not inconsistent with a holding that they were rental. In case of default, suit would lie against the lessee for rent, not against the stockholder for money due on stock or for an assessment on the stock. Not only has the petitioner failed to show that the payments in question were not in fact rental and income, but the evidence indicates that they were in fact rental. *Nowland Realty Co.*, 18 B. T. A. 405; affd., 47 Fed. (2d) 1018. The actual collections of the petitioner during the year 1926 and the year 1928 were larger than the amounts which the respondent contends should be included in the petitioner's income for those years. The contentions of the respondent on this point are sustained to the extent of the amounts claimed in his pleadings.

The last issue is decided for the respondent upon authority of *Commissioner* v. *Terre Haute Electric Co.*, 67 Fed. (2d) 697, which we now think correctly reversed the Board on the point.

Reviewed by the Board.

*Decision will be entered under Rule 50.*