The Bolta Company v. Commissioner.
Bolta Co. v. Commissioner
Docket No. 5638.
United States Tax Court
1945 Tax Ct. Memo LEXIS 31; 4 T.C.M. (CCH) 1067; T.C.M. (RIA) 45360; November 28, 1945
*31 1. Upon the evidence, held, the salvage value of certain machines determined by the respondent for depreciation purposes is sustained. 2. Upon the evidence, held, petitioner is entitled to a deduction for obsolescence of certain machinery and equipment which its officers during the taxable year determined would become obsolete at the close of the next taxable year. 3. Upon the evidence, held, petitioner is not entitled to a deduction for obsolescence of a certain machine, the cost of which was not proven. J. N. Welch, Esq., and Edward J. Keelan, Jr., Esq., 60 State St., Boston, Mass., for the petitioner. J. T. Haslam, Esq., for the respondent. BLACK
Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income tax, declared value excess-profits tax and *32 excess profits tax determined by the respondent against petitioner for the fiscal year ended November 30, 1941 in the amounts of $14,082.60, $2,744.97 and $13,992.40, respectively. The deficiencies result from 17 adjustments to the net income as disclosed by petitioner's return. Petitioner does not contest 14 of the adjustments and has consented to the assessment of approximately one-half of the deficiencies. By appropriate assignments of error petitioner does contest three of the adjustments, the first two of which are explained in a statement attached to the deficiency notice, as follows: (a) Loss from abandonment disal-
lowed
$ 1,451.98
The deduction of $1,451.98 claimed on line 23 of your 1941 fiscal year return on account of alleged abandonment of an Automatic Cutting Machine has been disallowed for the reason that the said asset had not been abandoned or discarded at the close of the fiscal year ended November 30, 1941 as contended in the affidavit of Harold F. Houston, Treasurer, which is attached to the return. (b) Loss from obsolescence disal-
lowed
$13,987.33
The deduction of $13,987.33 claimed on line 24 of your 1941 fiscal year *33 return, and explained in Schedule L (attached to the return) as due to "Obsolescence of Hard Rubber Comb Machinery and Equipment caused by the Office of Production Management's curtailment order of July 1941 and stoppage order of December 11, 1941, regarding the use of Rubber in the Manufacture of combs" is disallowed for the reason that the factors upon which a claim for obsolescence may be based did not exist during the fiscal year ended November 30, 1941. Relative to adjustment (a), petitioner now concedes that the respondent did not err in disallowing one-half of this adjustment in the amount of $725.99. Effect will be given to this concession under Rule 50. Petitioner still contests the remaining one-half. The third contested adjustment is "(h) Excessive depreciation disallowed $30,497.64." Petitioner, however, contests only $14,102.75 of this adjustment, which contested part is explained in a statement attached to the deficiency notice, in part, as follows: Depreciation claimed by you on injection machinery and incidental equipment in the amount of $41,555.76 is reduced to $27,453.01 reflecting a disallowance of $14,102.75. In determining the depreciation allowable on *34 this asset classification, a 25% salvage value has been determined on the basis of the history of your sales of discarded machines after having been in use for five years. The rate of depreciation has been based on an estimated five-year life pending the development of the machine units to the stage of efficiency demanded in your business. Findings of Fact Petitioner was incorporated under the laws of Massachusetts on May 6, 1929, with its principal place of business in Lawrence, Massachusetts. The returns for the period here involved were filed with the collector of internal revenue at Boston, Massachusetts. Adjustment (h). During the taxable year petitioner was the manufacturer of plastic products and its chief products of manufacture were combs and serving trays. The combs were made out of hard rubber and plastics. Prior to 1935 the combs were made by a socalled compression molding press (referred to further under adjustment (b)) but beginning in 1935, the so-called injection method of manufacturing plastics was introduced, and both methods were used until January of 1942 when the compression method was abandoned. In the injection method of manufacture a plunger forces *35 the heated plastic into a closed die and the heated material is immediately chilled, as the molds are cooled with refrigerated water. Some twenty to thirty seconds after the plastics enter the mold, the die is opened and the molding of the plastic into a comb is complete. The injection machine has a large capacity and the manufacture of combs by this process is considerably cheaper than their manufacture by the compression molding press, as it has but one finishing operation as against 20 for the older method. When operated at full capacity each injection machine was capable of turning out from 150 up to 250 gross of combs per day. The machines are operated 24 hours a day, six days a week. Efficient manufacture requires that they be kept in continuous operation so that they will retain a constant high temperature. The use of the injection process enabled petitioner to greatly reduce the selling price of its combs so that it was able to compete with its closest competitors. The manufacture of combs requires that the injection machines be accurate and exact within thousandths of an inch. A slight inaccuracy will result in imperfections in the combs. Because of the speed, the *36 strains, and the continuous operation of injection machines, inaccuracies develop; and it has been found that they will retain the necessary accuracy for use in manufacturing combs for only about five years. As yet, no method of completely correcting inaccuracies resulting from usage has been found. Products which do not require the high degree of accuracy called for in the petitioner's business can be manufactured in injection machines which, through usage, have lost the accuracy needed for comb manufacture. One use to which such machines can be put is in the manufacture of novelty items from metals. Some of petitioner's used machines have been sold to manufacturers in that field. From the time it began to use them until the close of the taxable year petitioner had disposed of a total of 11 of its injection machines. These machines had been purchased by it during the fiscal years 1936 to 1939, inclusive, at an aggregate cost of $81,402.98. Depreciation of $48,666.97 had been claimed and allowed, leaving unrecovered cost of $32,736.01. The machines were sold during the fiscal years 1937 to 1941, inclusive, at prices which aggregated $34,781.31, resulting in a net gain of $2,045.30. *37 The history of each of the 11 machines is shown by the petitioner's Exhibit 1, as follows: Cost
Machine
Fiscal Year
Deprecia-
No.
Purchased
Amount
tion
Net
1
11/30/36
4,197.50
1,679.00
2,518.50
2
11/30/36
9,499.94
9,499.94
3
11/30/36
9,499.94
9,499.94
4
11/30/36
6,822.13
6,822.13
5
11/30/37
9,950.30
5,223.91
4,726.39)
6
11/30/37
7,612.30
5,328.61
2,283.69
20
11/30/37
5,528.13
3,547.19
1,980.94
23
11/30/37
5,752.80
2,588.76
3,164.04
16
11/30/38
9,137.38
2,132.05
7,005.33
10
11/30/39
6,701.28
1,451.94
5,249.34
11
11/30/39
6,701.28
893.50
5,807.78
81,402.98
48,666.97
32,736.01
Sales Price
Machine
(Loss)
No.
Date
Amount
or Gain
1
1937
* 50.00
(2,468.50)
2
10/20/41
3
10/20/41
6,505.00
6,505.00 4
10/20/41
5
1/16/40
2,000.00
(2,726.39)
6
11/30/41
2,876.31
592.62 20
8/14/40
4,200.00
2,219.06 23
8/21/40
4,500.00
1,335.96 16
1/31/40
6,300.00
(705.33)
10
6/28/40
3,250.00
(1,999.34)
11
1/31/40
5,100.00
(707.78)
34,781.31
2,045.30 *38 Machine No. 1 was the first machine bought, and it quickly developed certain deficiencies. It was abandoned and sold for scrap the year after it was purchased. Machines Nos. 2, 3 and 4 were sold on October 20, 1941 for a total of $6,505 after they had served their usefulness to petitioner and after petitioner had claimed and been allowed the entire cost thereof as depreciation. This selling price was slightly in excess of 25 percent of the total cost of the machines of $25,822.01. They were sold at a time when equipment was getting scarce and in normal times they could not have been sold for that high a price. Machines Nos. 5 and 6 were a complete failure and never produced a commercial product. Petitioner sent both machines back to the company from which it purchased them. For No. 5 petitioner obtained a cash refund and for No. 6 a merchandise credit. Machines Nos. 20 and 23 were purchased from a different concern than the others, and were not satisfactory as far as accuracy was concerned. Petitioner experienced much breakage of parts with these machines. It considered them useless for its purposes and for that reason it sold them. Machines Nos. 16 and 11 were sold to petitioner's *39 Canadian company at a loss to petitioner. Machine No. 10 is a machine which petitioner purchased from a third concern during the fiscal year 1939. At the time petitioner sold the machine in 1940, its usefulness to petitioner had ended. Not included in petitioner's Exhibit 1, above, is machine No. 41 which petitioner purchased in 1941 for $15,541.87 and sold in 1944 for $7,500, after it had taken depreciation thereon of $8,777.86, thus realizing a gain of $735.99 on the sale. This represented a machine which had broken due to overstrain and had become useless to petitioner. Petitioner has about eight or ten of this type of machine. On its return for the fiscal year ended November 30, 1941, petitioner claimed depreciation on its injection machinery and incidental equipment in the amount of $41,555.76. This amount was computed on the basis of cost spread over a five-year life with no consideration given to any salvage value. The respondent determined that the depreciation on this property should be computed on the basis of cost spread over a five-year life with consideration given to a salvage value of 25 percent. He thus determined that instead of an allowance of $41,555.76, petitioner *40 was only entitled to an allowance of $27,453.01, which he computed as follows: Salvage
Depreciable
Accum.
Remaining
Year
Cost
25%
Cost
Depreciation
Yrs.
Cost
1936
$29,176.42
$29,176.52
$24,082.27
1/2
$ 5,094.15
1937
13,302.35
$ 3,325.59
9,976.76
9,090.83
1 1/2
885.93
1938
65,742.50
16,435.62
49,306.88
32,771.15
2 1/2
16,535.73
1939
36,576.13
9,144.03
27,432.10
10,956.97
3 1/2
16,475.13
1940
26,403.85
6,600.96
19,802.89
2,582.38
4 1/2
17,220.51
1941
88,266.60
22,066.65
66,199.95
5    66,199.95
Total Allowed
Allowable
Year
Depreciation
1936
$ 5,094.15
1937
590.62
1938
6,614.29
1939
4,707.18
1940
3,826.78
1941
6,619.99
Total Allowed
$27,453.01
The salvage value of petitioner's injection machines and incidental equipment was, as determined by the respondent, 25 percent of cost. Adjustment (b). Petitioner manufactured combs out of hard rubber as well as from plastics. The hard rubber combs were manufactured through open presses in which there were two die halves into which the material was loaded and the press was closed. The method of manufacturing *41 hard rubber combs referred to as the older method in the testimony needed about 20 additional operations to complete it, in excess of the operations used to manufacture plastic combs by the injection method. It was also necessary in manufacturing the rubber combs to cut tooth after tooth in the rubber blank. The ordinary compression press used for the manufacture of hard rubber combs operates from two to five minutes and frequently up to a half hour, in comparison with the injection method used which shortens the cycle to 12 to 30 seconds. The injection method discussed under adjustment (h) is much cheaper than the method used in the manufacture of hard rubber combs. In the manufacture of hard rubber combs, it was first necessary to cut out the rubber blank and then place the blank into a vulcanizer from 12 to 15 hours. The blank was then placed in a cutting machine to cut out the teeth and after that, some 12 to 15 more operations were necessary to round the comb, join it, grind it and polish it. Hard rubber is very difficult to work with as it scratches very easily. In comparison with the manufacture of the hard rubber, the manufacture of plastic combs by the injection method is *42 performed in one operation, as no hand touches the material after it is put into the hopper. In 1941, petitioner was manufacturing combs out of plastics through the injection molding machines and out of hard rubber through the old fashioned method of manufacture with compression presses and cutting machines. In July 1941, petitioner was advised by the United States government that there was a restriction on the purchase of rubber. Petitioner's representatives were advised also that they could not use more than 50 percent of their normal supply of rubber after July 1, 1941. Petitioner had sufficient rubber to continue the manufacture of hard rubber combs through the end of the fiscal year November 30, 1941 and manufactured some in the early part of the fiscal year ended November 30, 1942. In the summer of 1941, the president of New York Merchandise Company, petitioner's largest comb customer, advised petitioner that in his opinion rubber combs would never come back again, first, because they were too expensive and, second, because the new comb petitioner was producing with the injection machines was in many respects better than the hard rubber combs produced by the compression *43 presses and cutting machines. Petitioner's chairman of the board of directors was of the same opinion. In the same year, 1941, injection molds were developed to produce rubber injected combs so if rubber combs were never again manufactured they would be produced by the far cheaper injection method and the compression presses would not be used in the manufacture of combs. During the taxable year ended November 30, 1941, petitioner concluded that the compression presses used to manufacture combs would become completely obsolete by the close of the fiscal year ending November 30, 1942 because (1) there was very little likelihood of ever again manufacturing combs of hard rubber, and (2) if combs were manufactured from rubber, the injection method would be the method used. Petitioner ceased the manufacture of hard rubber combs sometime in January of 1942. On November 30, 1941, the depreciated cost of the compression presses which petitioner owned, was $27,974.65. One-half of this sum or $13,987.33, was claimed by petitioner in its return as a deduction for obsolescence for the fiscal year ended November 30, 1941. The respondent disallowed the deduction. In November, 1943, petitioner *44 sold the above mentioned compression presses together with the cutting machine mentioned under adjustment (a) below for the total amount of $429. Adjustment (a). In its return for the fiscal year ended November 30, 1941, petitioner claimed a deduction of $1,451.98 on account of the alleged abandonment of an automatic cutting machine. This machine was used in sawing out teeth in the hard rubber combs manufactured by the compression holding presses. This machine was used in the summer of 1941, but it was not used after January 1942. The machine was sold in November 1943, along with the compression presses mentioned in adjustment (b) above. The sale price of this machine was included in the above-mentioned amount of $429. Opinion BLACK, Judge: As previously stated, petitioner assigned errors as to only three of the 17 adjustments lettered (a) to (q), inclusive, made by the respondent to the net income as disclosed by petitioner's return. The contested adjustments are (a), (b) and (h). We will first consider adjustment (h). On its return petitioner had claimed depreciation on its injection machinery and incidental equipment in the amount of $41,555.76. The respondent determined *45 that the allowable depreciation on this property was $27,453.01 and that the $14,102.75 claimed by petitioner in excess thereof should be disallowed. The reason for respondent's action has been set out in our preliminary statement. The applicable statute is section 23 (1) of the Internal Revenue Code, the material portion of which is in the margin. [1] The applicable regulation is section 19.23(1)-1 of Regulations 103, as amended by T.D. 5196, Cumulative Bulletin 1942-2, p. 96, the material portion of which is also in the margin. [2]
*46 Petitioner and the respondent are agreed upon the cost of the property and upon the rate of depreciation. They disagree only upon the "salvage value" to be used in making the computation. Petitioner in its return did not take into consideration any salvage value but simply spread the cost over a period of five years. The respondent determined that the cost should first be reduced by a salvage value equal to 25 percent of the cost, and that, therefore, only 75 percent of the cost should be spread over a period of five years. Although petitioner in its return did not take into consideration any value for salvage, it apparently now concedes that at least 5 percent of the cost should be so considered, for in its brief it says "The petitioner contends that salvage value of not over 5% of the gross cost of the machinery should be used in determining the depreciation deduction; whereas, the respondent has determined that the salvage value of this machinery should be 25% of its cost." Notwithstanding this apparent concession, petitioner later in its brief states that what it did in its return "was in compliance with the instructions issued by the Bureau of Internal Revenue, as issued in *47 Bulletin F." This is a special bulletin on depreciation and obsolescence, first issued by the Treasury Department in 1920 and revised in January, 1942. Petitioner brings to our attention the following quotation from page 7 of the revised edition: Salvage. - Salvage value is the amount realizable from the sale or other disposition of items recovered when property has become no longer useful in the taxpayer's business and is demolished, dismantled, or retired from service. When reduced by the cost of demolishing, dismantling, and removal, it is referred to as net salvage. In principle, the estimated net salvage should serve to reduce depreciation, either through a reduction in the basis on which depreciation is computed or a reduction in the rate. In either instance the amount of net salvage should actually, or in effect, be a credit to the depreciation reserve. Where the basis or rate for depreciation is not reduced for estimated salvage, all net receipts from salvage should be considered income. Petitioner emphasizes the last sentence of the above quotation as representing authority for the manner in which it computed the depreciation allowance on its return and says that "If this *48 Court should find that salvage value should not be considered, the depreciation deducted by the petitioner in its return for injection machinery in the sum of $41,555.76 was correct." We think, however, that this is a case where salvage value can reasonably be estimated and should, therefore, be considered. The sentence from Bulletin "F" specifically relied upon by petitioner was intended to cover those cases where the probable salvage value could not reasonably be estimated. Obviously such a provision is necessary in order to prevent the recovery, tax free, of more than cost. In determining the annual depreciation allowance where it is possible to estimate the salvage value, the cost should first be reduced by such estimated value before applying thereto the rate of depreciation. See Terminal Realty Corporation, 32 B.T.A. 623, wherein we said: * * * The annual allowance may be computed by dividing the cost of the property by the number of years of its estimated life. If the probable salvage value can be estimated, it should be first deducted from cost, but if it can not be reasonably estimated, adjustment may be made for it later. Some later adjustment may also be *49 necessary to make up for errors in the estimate. A reasonable allowance is thus merely the equitable share of the expense of ultimate retirement of the plant assignable to each year. See also section 19,23(1)-1 of Regulations 103, as amended, supra, and United States v. Ludey, 274 U.S. 295, wherein the Supreme Court said: * * * The amount of the allowance for depreciation is the sum which should be set aside for the taxable year, in order that, at the end of the useful life of the plant in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost. * * * What was the salvage value of the injection machinery in question? This is a matter of proof. The respondent determined it was 25 percent of cost. Petitioner contends it was not in excess of 5 percent of cost. Up to some time in 1944 petitioner had disposed of 12 injection machines. The cost of these machines, the depreciation claimed and allowed, the year of acquisition and sale, and the sales price thereof are all set out in our findings of fact. Petitioner contends that because the net profit from the sale of the 11 machines set out in *50 Exhibit 1 was less than 3 percent of their original cost, and because the net profit from the sale of machine No. 41 was slightly over 4.73 percent of its cost, that this is sufficient proof by itself to support petitioner's contention that a salvage value of not more than 5 percent should be considered. We do not agree with this contention. These machines, with the exception of machines Nos. 2, 3 and 4, had not been held for five years and therefore had not fully depreciated at the time of sale and were sold for the most part because of special defects. We think that because of those facts the gain or loss from the sale of such machines under special circumstances can have little bearing on determining the salvage value of machines that have been used for five years. The situation is entirely different with respect to machines Nos. 2, 3 and 4. Those machines cost $25,822.01. Petitioner had used them for five years and had claimed and had been allowed their full cost as depreciation. They were then sold for $6,505, which was slightly in excess of 25 percent of their original cost. The respondent contends that the sale of these three machines tends to support his determination. Petitioner *51 offered testimony to show that when these three machines were sold on October 20, 1941, equipment was becoming scarce and that in "normal times" they could not have been sold for that high a price. We think the world situation at the end of 1941 was such that one could reasonably expect that the manufacture of civilian goods and the production of machinery therefor would be more and more seriously curtailed over the years to follow. Experience has fully justified such expectations. The injection machines had only five years of useful life for petitioner's purposes, but they could be used and were used in other businesses. It is for these reasons that we think the evidence relating to machines Nos. 2, 3 and 4 is the best evidence in the record as to the probable salvage value of petitioner's injection machines upon which it is now claiming a depreciation allowance. Petitioner's president who had graduated from the University of Darmstadt in Germany with a bachelor's certificate testified that "as engineers we place no value on the machine after five years except their scrap value. The motor is the only part that has a useful life after five years" and that "We figure that five per *52 cent is about all we can recover of the value after five years." This testimony, however, does not coincide with the actual facts. The only machines that were sold by petitioner after they had been used by petitioner for the normal period of five years were the above mentioned machines Nos. 2, 3 and 4, and these machines were sold for slightly more than 25 percent of their original cost. We sustain the respondent's determination upon this issue. We will now consider adjustment (b). The issue here is whether the respondent erred in disallowing $13,987.33 claimed by petitioner as a deduction for obsolescence of its hard rubber comb machinery and equipment. As to when property will become obsolete is a question of fact. Crooks v. Kansas City Title & Trust Co., 46 Fed. (2d) 928, 930. The applicable statute is section 23(1), I.R.C., the material portion of which is in footnote 1 above. The applicable regulation is section 19.23(1)-6 of Regulations 103, which is in the margin. [3]
*53 In Real Estate-Land Title & Trust Co. v. United States, 309U.S. 13, the Supreme Court in passing upon an essentially similar statute and regulation, among other things, said: * * * the term "allowance for obsolescence" as used in the Act and in the Treasury Regulations has a narrower or more technical meaning than that derived from the common, dictionary definition of obsolete. The Treasury Regulations state the circumstances under which an allowance for obsolescence of physical property may be allowed, viz., where such property is "being effected by economic conditions that will result in its being abandoned at a future date prior to the end of its normal useful life, so that depreciation deductions alone are insufficient to return the cost (or other basis) at the end of its economic term of usefulness." This Court, without undertaking a comprehensive definition, has held that obsolescence for purposes of the revenue acts "may arise from changes in the art, shifting of business centers, loss of trade, inadequacy, supersession, prohibitory laws, and other things which, apart from physical deterioration, operate to cause plant elements or the plant as a whole to suffer diminution *54 in value." * * * Such specific examples illustrate the type of "economic conditions" whose effect on physical property is recognized as obsolescence by the Treasury Regulations. Others could be mentioned which similarly cause or contribute to the relentless march of physical property to the junk pile. * * * obsolescence under the Act requires that the operative cause of the present or growing uselessness arise from external forces which make it desirable or imperative that the property be replaced. What those operative causes may be will be dependent on a wide variety of factual situations. "New and modern methods" appear to have been one of the real causes of abandonment of the title plant in Crooks v. Kansas City Title & Trust Co., supra.* * * In the instant proceeding "new and modern methods" of manufacturing combs had convinced the officers of petitioner in the summer of 1941 that the machines it was using under the old compression method were headed for the junk pile. The evidence proves this beyond all doubt. The new injection process was much faster, made better combs and was far less expensive than the old compression method. In his brief the respondent states *55 his position as follows: The petitioner says in effect that in 1941 two factors had rendered the manufacture of combs by the compression method obsolescent. The two factors are said to be (1) restrictions placed by the Government on the use of rubber, and (2) the advancement of the cheaper and more efficient method of the manufacture of combs out of plastic by injection machines. The respondent takes the position that the first factor has no bearing whatsoever on the obsolescence of the machines, and that with respect to the second factor the proof fails to show the extent, if any, to which it resulted in obsolescence in the taxable year. It may be true that the restriction placed by the Government on the use of rubber had a tendency to bring this factual obsolescence situation to a head in the taxable year 1941, but we are convinced from the evidence that the situation existed in fact irrespective of the restrictions placed on rubber. The president of petitioner's largest customer told petitioner's chairman of the board, John Bolten, in 1941: "John, rubber combs will never come back again. First, they are too expensive, and second, the new vinalite combs you are producing now *56 are in many respects even better than your hard condirubber combs were." Bolten testified that he "* * * wanted to have the whole machinery taken off our books because they were no good to us; there was no future. As far as I was concerned it was nothing but a junk pile. But Harold Houston, our treasurer, said it is better, for some reasons, to divide it into two years." Subsequent events have proved the correctness of petitioner's belief in 1941 that the economic term of usefulness of its hard rubber comb machinery and equipment would not extend beyond the next fiscal year. Petitioner ceased the manufacture of hard rubber combs sometime in January of 1942 and sold its hard rubber comb machinery and equipment for a fraction of its cost in 1943. It is clear from the evidence that by the end of 1941 petitioner knew its supply of hard rubber would be exhausted in early 1942 and if it ever resumed the manufacture of hard rubber combs at a later date it would be by the injection method and not the compressed method. The parties have agreed that the depreciated cost of the machinery involved on November 30, 1941 was $27,974.65. We hold that petitioner is entitled to a deduction of one-half *57 of this amount as obsolescence in the fiscal year ended November 30, 1941. The respondent's determination on this issue is reversed. Crooks v. Kansas City Title & Trust Co., supra, and cases there cited. Adjustment (a). In its return petitioner claimed a deduction of $1,451.98 as a loss from abandonment of an automatic cutting machine. The respondent disallowed the deduction for the reasons given in a statement attached to the deficienc0 notice which we have set out above in our opening statement. Petitioner assigned error "In the determination that the loss * * * should be disallowed in its entirety." In its petition petitioner also alleged that "In May, 1941, the petitioner purchased an automatic cutting machine at a cost of $1,451.98 * * *"; and that In the tax return filed by the petitioner for the year ended November 30, 1941, the total cost of this machine, namely, $1,451.98, was claimed as a deduction from taxable income. The petitioner now believes that this should be amortized over the fiscal years ended November 30, 1941 and November 30, 1942; one-half being allowed as a deduction from taxable income for the fiscal year ended November 30, 1941 in the sum *58 of $725.99. The respondent in his answer admitted "that in the tax return filed by the petitioner for the fiscal year ended November 30, 1941, the sum of $1,451.98 was claimed as a deduction from taxable income" but for lack of information denied all the remaining allegations relative to this issue. In its brief petitioner says "The same argument relates to this machine as relates to the obsolescence of the compression machinery and it is the contention of the petitioner that one-half the cost of this machine should be charged off in the fiscal year ended November 30, 1941 and the balance in the year ended November 30, 1942." Petitioner offered no proof as to the cost of this machine and the respondent specifically relies upon this lack of proof as one of his reasons why no deduction may be allowed in respect of this machine. Even if we disagreed with all of the respondent's other reasons as to why no deduction may be allowed relative to this machine, we could not sustain petitioner's contentions without proof of cost. In this respect this issue differs from the preceding issue. In the trial of that issue the parties stipulated the remaining undepreciated cost of the machines *59 there in question. No such stipulation or other evidence was offered as to the cost of the automatic cutting machine here involved. We therefore, sustain the respondent's determination as to this issue. [1]
*60 Decision will be entered under Rule 50. Footnotes
*. Junked and sold with other junk. Estimated portion of total sales price attributable to this machine $50.↩
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * * * *
(1) Depreciation. - A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - (1) of property used in the trade or business. * * * ↩
2. Sec. 19.23(1)-1. Depreciation. - A reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in the trade or business * * * may be deducted from gross income. For convenience such an allowance will usually be referred to as depreciation, excluding from the term any idea of a mere reduction in market value not resulting from exhaustion, wear and tear, or obsolescence. The proper allowance for such depreciation is that amount which should be set aside for the taxable year in accordance with a reasonably consistent plan (not necessarily at a uniform rate), whereby the aggregate of the amounts so set aside, plus the salvage value, will, at the end of the useful life of the depreciable property, equal the cost or other basis of the property determined in accordance with section 113. * * *↩
3. Obsolescence. - With respect to physical property the whole or any portion of which is clearly shown by the taxpayer as being affected by economic conditions that will result in its being abandoned at a future date prior to the end of its normal useful life, so that depreciation deductions alone are insufficient to return the cost or other basis at the end of is economic term of usefulness, a reasonable deduction for obsolescence, in addition to depreciation, may be allowed in accordance with the facts obtaining with respect to each item of property concerning which a claim for obsolescence is made. No deduction for obsolescence will be permitted merely because, in the opinion of a taxpayer, the property may become obsolete at some later date. This allowance will be confined to such portion of the property on which obsolescence is definitely shown to be sustained and cannot be held applicable to an entire property unless all portions thereof are affected by the conditions to which obsolescence is found to be due.↩
1. Motion of the Commissioner striking from the opinion the sentence which appeared at this point is reproduced herein: "MOTION" "Comes now the Commissioner of Internal Revenue, by his attorney, J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and moves that the Tax Court amend its Memorandum Findings of Fact and Opinion entered herein on November 28, 1945, by striking from the opinion the last sentence appearing on page 18 thereof. "As grounds for the motion, respondent states that the Court is without jurisdiction to decide matters which will enter into the determination of the petitioner's income tax and excess-profits tax liability for the taxable year 1943 since the only taxable year involved in this proceeding is the fiscal year ended November 30, 1941. "WHEREFORE, it is prayed that this motion be granted. (SIGNED) J. P. WENCHEL, CPR, J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue. "OF COUNSEL: Charles P. Reilly, Division Counsel, A. J. McDowell, Special Attorney, Bureau of Internal Revenue The Tax Court of the U.S., GRANTED, Dec. 13, 1945, (Signed) Eugene Black↩, Judge"