740 F.2d 382
 84-2 USTC P 9771
 HIBERNIA NATIONAL BANK IN NEW ORLEANS, TRUST DIVISION,
Trustee Under Liquidation Trust by Royal St.
Louis, Inc., Formerly a Louisiana
Corporation, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 83-3465.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 4, 1984.
 
 Victoria J. Sherlock, Atty., Ernest J. Brown, Glenn L. Archer, Jr., Asst. Atty. Gen., Jonathan S. Cohen, Michael L. Paup, David English Carmack, Attys., Tax Division, Dept. of Justice, Washington, D.C., for defendant-appellant.
 Monroe & Lemann, Stephen B. Lemann, New Orleans, La., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before TIMBERS,* POLITZ, and RANDALL, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 The Commissioner of Internal Revenue appeals the district court's grant of summary judgment, 569 F.Supp. 5 (D.La.1983) in favor of the taxpayer, Hibernia National Bank in New Orleans, Trust Division, in this action seeking a refund of deficiencies paid following disallowance by the Commissioner of depreciation deductions on the furniture and equipment in the Royal Sonesta Hotel in New Orleans. We reverse and remand.
 
 I.
 
 2
 In 1967, Royal St. Louis, Inc., the predecessor of the taxpayer,[1] through its subsidiary Chateau Louisiane, Inc. ("Chateau"), granted a lease to Royal Orleans, Inc. ("Royal Orleans"), for the construction, furnishing and operation of the Royal Sonesta Hotel to be located in the French Quarter in New Orleans. The lease provided for the construction of a "first class" hotel to be built by Chateau, as lessor, in the agreed location. The lease was for a term of twenty-five years with three options to renew for additional ten year periods. Under the lease, Chateau was initially to supply all furniture, appliances, carpets, draperies, silverware, china, glassware, kitchen utensils, fixtures and movable equipment for the bars, kitchen, restaurants, butcher and bakery shops, pantries and other movable fixtures and equipment required for the operation of the hotel. In accordance with the lease, Chateau supplied furnishings and equipment for the hotel at a cost of $1,672,284.83.[2] These were carried on Chateau's books as fixed assets.
 
 
 3
 The lease made the following provisions with respect to maintenance of the furnishings and equipment and of the buildings and improvements:
 
 
 4
 8. Tenant shall at its own expense maintain all of the furnishings and equipment in first class condition, replacing the same when necessary for such purpose, (except where prevented from so doing by material or labor shortages, strikes, war restrictions or governmental restrictions), the cost whereof shall be deductible as an expense in computing Net Profit hereunder. All furnishings installed in the demised premises by Tenant, whether as replacements or additions, shall forthwith become the property of Landlord and a portion of the property leased to Tenant.
 
 
 5
 * * *
 
 
 6
 * * *
 
 
 7
 12. (a) The Tenant will at all times keep and maintain the demised premises and all buildings and improvements at any time situated thereon in good rentable order and condition, reasonable wear and tear excepted, and shall take good care of the personal property used in connection with the operation thereof, renewing, repairing and supplementing the same as may be necessary in the proper conduct of the hotel (except where unavailable due to circumstances beyond the Tenant's control).
 
 
 8
 (b) During each period of three lease years during the original term only of this lease, Tenant covenants to expend upon the demised premises, the building and fixtures therein, and the furniture, furnishings, equipment, trade fixtures and other chattel property of every kind, nature and description located and used in the conduct of the hotel business therein, for repairs, decoration and redecoration, replacements, renewals, alterations, additions, and/or improvements, whether by way of capital improvements or otherwise, not less than the sum of $600,000.00, inclusive both of such expenditures through direct labor on Tenant's payroll for carpenters, masons, electricians and other craftsmen and employees, and of such expenditures made through independent contractors or subcontractors, and/or also through the purchase and acquisition of materials and of any such chattel property and installation thereof.
 
 
 9
 * * *
 
 
 10
 * * *
 
 
 11
 26. Upon the termination or expiration of this lease, Tenant shall surrender to Landlord the demised premises in good condition and repair, ordinary wear and tear and injury by fire or other casualty or by acts of God excepted.
 
 
 12
 Thus, under the lease Royal Orleans was obligated to maintain and replace the furnishings and equipment in order to maintain them in "first class" condition; and Royal Orleans was required to expend a minimum of $600,000 for repairs and replacement of the building, fixtures, furniture and equipment in each three year lease period.[3]
 
 
 13
 Chateau claimed depreciation on the furnishings and equipment for the tax year 1970. In 1974, the Commissioner, claiming that the above-quoted terms of the lease evidenced the parties' intention that Chateau should be protected from all economic loss, disallowed the depreciation deduction for furnishings and equipment. Chateau sued for a refund; the district court upheld the government, Royal St. Louis, Inc. v. United States, 76 T.C. 2 (E.D.La.1976), and this court affirmed, 578 F.2d 1017 (5th Cir.1978).
 
 
 14
 Following the district court's decision, Chateau and Royal Orleans agreed on September 1, 1977 to make certain amendments to the lease "so as to clarify the original intent of the parties." The amendments were basically to provide that the furnishings and equipment would now be returned to Chateau in first class condition subject to normal wear and tear. The amendments were as follows:
 
 Hotel Lease Amendment No. 2
 
 15
 WHEREAS, it has become apparent that certain changes should be made in the Lease so as to clarify the original intent of the parties,
 
 
 16
 NOW, THEREFORE, the parties agree that the Lease between them shall be and the same is hereby further amended as follows:
 
 
 17
 1. By providing that the furnishings and equipment provided by Landlord pursuant to the provisions of Paragraph (c) of Section 7 of the Lease shall be construed as a portion of the property leased by Landlord to Tenant.
 
 
 18
 2. By adding the following to Section 8 of the Lease:
 
 
 19
 "Tenant's obligation to maintain the furnishings and equipment shall be construed in accordance with the provisions of Article 2719 and 2720 of the Revised Civil Code of Louisiana, except only as modified by the obligations of the parties pursuant to Sections 21 and 22 of this Lease."
 
 
 20
 3. By adding to Section 26 of the Lease, following the words "the demised premises", the words "(including the furnishings and equipment)".
 
 
 21
 As in 1970, Chateau claimed depreciation on the furnishings and equipment that it initially placed in the hotel, in determining its income tax liability for the years 1971 through 1977.[4] The Commissioner again disallowed the depreciation deductions for the years 1972-1977.[5] After paying the assessed deficiency, Chateau filed a claim for a refund. When this claim was rejected, the taxpayer brought this suit seeking to recover the assessed payment plus statutory interest from the date of payment.[6]
 
 
 22
 Following the completion of discovery, the Commissioner moved for summary judgment, which was denied. The taxpayer then filed its own motion for summary judgment. The Commissioner opposed the taxpayer's motion on three grounds: (1) the amendments to the lease do not sufficiently clarify Chateau's and Royal Orleans' intention that Chateau is to be exposed to some economic loss; (2) in any event, the changes cannot be applied retroactively; and (3) the taxpayer is collaterally estopped from litigating in the present suit the same issues decided in the prior case.
 
 
 23
 The district court granted the taxpayer's motion for summary judgment. The district court determined that the lease, as amended, "now clearly exposes [Chateau] to potential economic loss on the furnishings and equipment ...." The district court also determined that the amendment was a material factual change which lifted the bar of collateral estoppel for all years in issue. Thus, the district court determined that the taxpayer was entitled to the depreciation deductions.
 
 II.
 
 24
 Section 167 of the Internal Revenue Code of 1954 provides for the allowance of a depreciation deduction for the exhaustion, wear and tear of property used in a trade or business or held for the production of income, including a reasonable allowance for obsolescence. I.R.C. Sec. 167 (1982). The deduction for depreciation allows a taxpayer to recover, tax-free, over the years an asset is used in a business, the capital which he has invested in the asset. H.R.Rep. No. 1337, 83d Cong., 2d Sess. at 22 (1954), U.S.Code Cong. & Admin.News 1954, p. 4184. It represents a return to the taxpayer of his investment in the property over the property's useful life, minus any salvage value, and is intended only to protect the taxpayer from a loss, not to provide him with a profit. Massey Motors, Inc. v. United States, 364 U.S. 92, 101, 80 S.Ct. 1411, 1416, 4 L.Ed.2d 1592 (1960). The allowance for depreciation is meant to approximate and reflect the probable financial consequences to the taxpayer of the effects of time and use on the value of his capital asset. Detroit Edison Co. v. Commissioner, 319 U.S. 98, 101, 63 S.Ct. 902, 903, 87 L.Ed. 1286 (1943). Section 1.167(a)-1(a) of the Treasury Regulations provides that the aggregate amount to be allowed as depreciation over the useful life of the asset should, when added to a reasonably estimated salvage value, equal, but not exceed, the taxpayer's cost or other basis. Section 1.167(a)-1(e) of the Treasury Regulations defines salvage value as "the amount (determined at the time of acquisition) which is estimated will be realized upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business." Salvage value is the actual resale price which the taxpayer can expect to realize upon disposition of the asset when the taxpayer's use of it in his business terminates. It is not some nominal or "junk" value. Massey Motors, Inc. v. United States, supra, 364 U.S. at 100-01, 80 S.Ct. at 903-04.
 
 
 25
 Because the purpose of depreciation is to allow the taxpayer to recover an economic loss, where it is clear that the taxpayer will suffer no economic loss, no deduction is allowable. Royal St. Louis, Inc. v. United States, supra, at 1018. Thus, the applicable test in determining whether a deduction for depreciation is allowable is whether it is reasonable to believe, upon the basis of conditions known to exist at the end of the tax year for which the claim is being made, see Treas.Reg. Sec. 1.167(b)-0 (1977), that the taxpayer will probably suffer an economic loss from a decrease in salvage value due to depreciation or obsolescence. Royal St. Louis, Inc. v. United States, supra, at 1018.
 
 
 26
 In the context of a lease, where the terms of the lease require the lessee to return the leased property to the lessor upon expiration of the agreement in the same condition as at the beginning of the lease, or its equivalent in value, or otherwise fully protect the lessor from economic loss, no deduction for depreciation of the leased property is allowable. Royal St. Louis, Inc., supra; Kem v. Commissioner, 432 F.2d 961 (9th Cir.1970); Georgia Railway & Electric Co. v. Commissioner, 77 F.2d 897 (5th Cir.1935). On the other hand, a lessor may be entitled to depreciation under the terms of a lease requiring the lessee only to make all necessary repairs and replacements and to maintain the property in good condition during the term of the lease, where it can be demonstrated that the lessor will suffer economic loss during the term of the lease. Alaska Realty Co. v. Commissioner, 141 F.2d 675 (6th Cir.1944); Gulf, Mobile Northern Railroad Co. v. Commissioner, 83 F.2d 788 (5th Cir.), cert. denied, 299 U.S. 574, 57 S.Ct. 38, 81 L.Ed. 423 (1936); Terminal Realty Corp. v. Commissioner, 32 B.T.A. 623 (1935).
 
 III.
 
 27
 The issue presented by this appeal is whether the district court erred in holding that the taxpayer was entitled to depreciation deductions for furnishings and equipment for the years 1972-1977. The starting point for our inquiry is this court's opinion in the prior incarnation of this controversy. In Royal St. Louis, Inc. v. United States, supra, we examined the lease between Chateau and Royal Orleans as originally drafted and determined that the lease imposed upon Royal Orleans the obligation to return to Chateau, at the termination or expiration of the lease, furnishings and equipment of equal value as that provided, so as to preclude economic loss to Chateau. Accordingly, we held that Chateau was not entitled to a depreciation deduction on the furnishings and equipment.
 
 
 28
 The Commissioner contends that the resolution of this issue in our prior opinion operates as collateral estoppel in the present suit as to the years 1971-1976. We agree. Collateral estoppel operates to bar in any future lawsuit the relitigation of an issue of ultimate fact by the party against whom the issue is determined by a valid and final judgment. See generally 1B Moore's Federal Practice p 0.441[3.-2] (2d ed. 1983). We have previously listed three traditional requirements for the application of the doctrine of collateral estoppel: (1) the issue to be concluded must be identical to that involved in the prior action; (2) in the prior action the issue must have been "actually litigated"; and (3) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment. Port Arthur Towing Co. v. Owens-Illinois, Inc., 492 F.2d 688, 692 n. 6 (5th Cir.1974). In the field of taxation, collateral estoppel has a somewhat narrower application: "It must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable rules remain unchanged." Commissioner v. Sunnen, 333 U.S. 591, 599-600, 68 S.Ct. 715, 720, 92 L.Ed. 898 (1948).
 
 
 29
 The district court below determined that the 1977 amendment to the lease could be considered a factual change which bars application of collateral estoppel to the issue of the parties' intent as to all years in question. We find that this determination by the district court was based upon an erroneous application or conception of the pertinent statutes and regulations. A failure by the district court to apply correctly the law and regulations is an error that may be corrected by this court on appeal. Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248 (1943); Commissioner v. Mutual Fertilizer Co., 159 F.2d 470 (5th Cir.1947).
 
 
 30
 Section 1.167(b)-0 of the Treasury Regulations provides, inter alia, that the determination of the amount of depreciation properly allowable "shall be determined upon the basis of conditions known to exist at the end of the period for which the return is being made." In other words, in determining whether a depreciation deduction will be allowed, we must look to the facts and conditions as they are known to exist at the end of the tax year for which the claim is being made. The district court erroneously utilized the 1977 amendment to determine the tax consequences for the years 1971-1976. The primary issue in this and the prior action is the intent of the parties. In 1970, Chateau litigated the issue of the parties' intent as to the lease as drafted in 1967. The district court determined and this court affirmed that the parties' intent was to insulate Chateau from economic loss. At the end of each tax year through 1976, there had been no change of facts with respect to the lease. Not until September 1, 1977 did Chateau and Royal Orleans amend the lease in an attempt to circumvent the district court's determination. Thus, this amendment has no relationship to the tax periods prior to 1977 in determining the issue of the parties' intent.
 
 
 31
 The taxpayer argues, however, that the 1977 amendment can be utilized as a "subsequent event" in order to determine the parties' intent in the years 1971-1976. Courts may sometimes utilize "subsequent events" as evidence of a taxpayer's intent in prior years. See Motor Fuel Carriers, Inc. v. Commissioner, 559 F.2d 1348 (5th Cir.1977); Sterling Distributors, Inc. v. United States, 313 F.2d 803 (5th Cir.1963). The taxpayer argues that the 1977 amendment is a subsequent event that clarifies the original intent of the parties. We do not believe, however, that the 1977 amendment may be used as a subsequent event in this case. First, the cases cited by the taxpayer deal principally with the accumulated earnings tax. I.R.C. Sec. 531. The regulations to that provision specifically provide that subsequent events may be considered to determine whether the taxpayer actually intended to consummate or had actually consummated the plans for which the earnings and profits were accumulated. Treas.Reg. Sec. 1.537-1(b)(2) (1960). No such regulation is applicable to depreciation. Further, even if subsequent events may be considered in some circumstances in determining the validity of depreciation deductions, we do not think that this is such a circumstance. In none of the cases cited by the taxpayer was the court faced with the collateral estoppel effect of a prior court judgment. Further, in each of the cases cited by the taxpayer, the subsequent event had a significance independent of the tax consequences; none involved an overt attempt to circumvent a court's determination. To accept the position of the taxpayer in this case would be to obviate, for all practical purposes, the operation of collateral estoppel as to questions of intent. When faced with an unfavorable decision by a court, all a party would have to do is draft a document clarifying its original intent and contradicting the court's finding; the party would then be free to relitigate the intent issue, utilizing this "subsequent event." We do not believe that parties to a lawsuit should be so free to relitigate the issue of their original intent, once that intent has been conclusively determined by a neutral tribunal. Moreover, courts have previously held that subsequent events are irrelevant where there is an attempt to recharacterize the transactions in question. Noble v. Commissioner, 368 F.2d 439, 443 (9th Cir.1966); United States v. Simon, 281 F.2d 520, 526 (6th Cir.1960); Leicht v. Commissioner, 137 F.2d 433, 435 (8th Cir.1943).
 
 
 32
 Thus, we find that the issue in this case as to the years 1971-1976 is the exact issue decided by the district court and affirmed by this court in the Royal St. Louis case. That issue was necessary to the resulting judgment and was actually litigated. See Port Arthur Towing Co. v. Owens-Illinois, supra. Additionally, we find that there were no changes in the controlling facts or applicable rules within the period 1970-1976. See Commissioner v. Sunnen, supra. Accordingly, we hold that the taxpayer is collaterally estopped from relitigating, in the present action, the issue of whether the parties intended under the original 1967 lease agreement that Chateau be insulated from economic loss. The district court's judgment, insofar as it applies to the years 1971-1976, is thus reversed and remanded.
 
 IV.
 
 33
 Collateral estoppel cannot apply, however, to the year 1977. At the end of the 1977 tax year, the lease had been amended. Thus, the issue before the court as to 1977 was whether the lease, as amended, evidenced an intent that Chateau be insulated from economic loss. This is a different issue than that litigated in 1970, i.e., whether the lease as originally drafted evidenced such an intent. Thus, collateral estoppel cannot apply and the parties are free to litigate in this action the appropriateness of the 1977 depreciation deduction.
 
 
 34
 The district court held that the lease, as amended, no longer evidenced an intent to insulate Chateau from economic loss. In so holding, the district court said:
 
 
 35
 The Fifth Circuit's major premise for denying depreciation was that the "wear and tear" exception was omitted with respect to furnishings, equipment and other personalty. The lease revision specifically amends Sections 8 and 26 to include this exception, with respect to Section 8, by incorporating Louisiana Civil Code Articles containing the "wear and tear" exception.
 
 
 36
 The district court thus determined that the taxpayer was entitled to the depreciation deductions for furnishings and equipment.
 
 
 37
 We must respectfully disagree with the determination made by the district court, although we recognize that its determination is due in significant part to some admitted inconsistency in our prior opinion. While in our prior opinion we did focus somewhat upon the absence of a "wear and tear" exception, we also focused upon the covenant to maintain the furnishings and equipment in "first class" condition. The 1977 amendment adds a "wear and tear" exception; however, the underlying and governing covenant has not been altered. We believe that the failure to amend this underlying covenant evidences no intent to alter anything in an economic sense. A "wear and tear" exception at termination of the lease, taken together with a requirement to maintain the furnishings and equipment in "first class" condition, amounts to no exception at all. In our prior opinion, we construed the term "first class" as it appears in the lease as follows:
 
 
 38
 Section 7(a) required the lessors to construct a "first class hotel." Under well established principles of contract law, we must presume that the contracting parties intended that the same words appearing in different clauses be given a meaning consistent with each other. LSA-C.C Arts. 1948, 1955; Plantation Pipe Line Co. v. Kaiser Aluminum & Chemical Corp., 222 So.2d 905 (La.App.1969). The use of the words "first class" with respect to the construction of the hotel leads us to the conclusion that the parties intended the lessee to be furnished with a new, functional hotel, a structure which at its completion lacked any wear and tear, obsolescence or other economic loss. A similar interpretation must be given to the words "first class condition" as it appears in Section 8.
 
 
 39
 As long as the covenant to maintain the furnishings and equipment in first class condition (as construed by this court) remains, we do not think that Chateau is subject to any significant economic loss. Indeed, there was no evidence whatsoever presented that the 1977 amendment altered the economics of the parties' relationship with respect to furnishings and equipment. To the contrary, the evidence shows that the parties continued to operate under the status quo; Royal Orleans continued to expend as much money as ever in maintaining and replacing furnishings and equipment in order to maintain them in "first class" condition. Without a change in the economics of the transaction, the 1977 lease amendments amount to nothing more than window dressing in an obvious attempt to circumvent the prior decision of this court without any material change in the manner in which the parties carried out the lease. Accordingly, we hold that the 1977 lease amendments made no material change in Royal Orleans' obligations under the lease as to furnishings and equipment and that, therefore, Chateau remains insulated from economic loss as to those items. The district court's grant of summary judgment with regard to the year 1977 is thus reversed and remanded.
 
 
 40
 We note that our holding here is limited to the particular and somewhat unique facts of this case--the provisions of this particular lease, the evidence of the practice of the parties in carrying out the lease provisions, and the fact that this lease had been once before interpreted by this court. The judgment of the district court is REVERSED and REMANDED, for further proceedings consistent with this opinion.
 
 
 41
 SO ORDERED.
 
 
 
 *
 Circuit Judge of the Second Circuit, sitting by designation
 
 
 [1]
 Chateau Louisiane, Inc. was liquidated and dissolved on September 9, 1981, and its assets were distributed to its parent, Royal St. Louis, Inc. Royal St. Louis, Inc. was liquidated and dissolved on September 18, 1981. The taxpayer is the trustee under a liquidating trust by Royal St. Louis, Inc., and its subsidiary
 
 
 [2]
 Paragraph 7 of the lease provides in pertinent part:
 
 
 [7]
 (a) Landlord agrees at its cost and expense to construct on the demised premises a first class hotel of approximately 489 rooms, as described in the construction contract passed by act before the undersigned Notary Public of even date herewith between Landlord and Henry C. Beck Company, and costing not more than $16,000,000
 * * *
 (c) The Landlord shall provide all furniture, appliances, linens, carpets, draperies, silverware, china, glassware, kitchen utensils, fixtures and movable equipment for the bars, kitchen, restaurants, butcher and bakery shops, pantries and other movable fixtures and equipment required for the operation of the hotel, (herein called "furnishings and equipment"), together with air conditioning, including refrigeration and kitchen air conditioning. The furnishings and equipment to be supplied and installed by Landlord shall be purchased by Landlord pursuant to the specifications of Tenant; such specifications shall be subject to the approval of Landlord, which approval Landlord agrees not to unreasonably withhold.
 
 
 [3]
 In fact, during the five years for which this refund is sought, Royal Orleans spent sums greatly in excess of the minimum required under the lease provision. The record indicates that for the years 1972-1976, Royal Orleans expended $2,500,000 for the purposes set out in paragraph 12(b)
 
 
 [4]
 Chateau took the following depreciation deductions:
 Year Deduction
---- -----------
1971 $275,076.32
1972 207,108.03
1973 161,408.88
1974 132,945.96
1975 109,168.00
1976 85,011.00
1977 84,726.00
 
 
 [5]
 Although no deficiency was determined for 1971, the depreciation issue for that year is to be considered here to determine the proper size of the net operating loss carryover to tax years for which a refund is sought
 
 
 [6]
 The taxpayer claims a refund for the following deficiencies plus interest paid:
 Year Tax Interest
---- --- ---------
1972 $ 67,612.91 $ 37,871.10
1973 258,702.00 129,273.32
1974 273,485.35 118,984.35
1975 120,456.37 42,721.49
1976 40,805.56 11,168.90
1977 40,668.12 8,968.49