**UNITED STATES of America, Plaintiff,**

v.

**Walter V. GRANT, Jr. (1), Defendant.**

No. 3:96–CR–127–X.

United States District Court,
N.D.Texas,
Dallas Division.

July 26, 1996.

Phil Umphres, Asst. U.S. Atty., Dallas, TX, for the U.S.

Dennis Brewer, Brewer & Brewer, Irving, TX, for defendant.

### MEMORANDUM OPINION AND ORDER DENYING WALTER V. GRANT, JR.'S MOTION TO WITHDRAW PLEA OF GUILTY

KENDALL, District Judge.

Before the Court is the Defendant Walter V. Grant, Jr.'s Motion To Withdraw Plea Of Guilt Pursuant To Rule 32(e) and Rule 11(e) filed July 22, 1996. After an evidentiary hearing on July 22, 1996, the Court, from the bench, denied the Defendant's motion to withdraw plea of guilty, which was filed within an hour of the scheduled sentencing and tendered to the Court and the Government approximately 10 minutes before the sentencing hearing began.

The Court articulated reasons from the bench for denying the motion and a full hearing was had in which the Defendant and his counsel were allowed ample opportunity to articulate their reasons for wishing to withdraw the April 15, 1996 guilty plea. This written order and opinion is for the purpose of completely and fully setting forth the Court's reasoning for its decision and is meant to be in supplementation of the reasons given on the record in open court.

Mr. Grant is a college-educated, doctorate degree-holding televangelist. On April 15, 1996, he pleaded guilty under the terms of a plea agreement to tax evasion, with a guaranteed guideline calculation and cap of his sentence[1]. The defendant signed a factual resume admitting all of the elements of the offense. During the plea colloquy, he testified under oath that he was guilty, that he read and understood every document that he signed, and he swore to and stipulated that all of the elements of the indictment, as well as the factual resume were true and correct. During the presentencing process, he gave a statement to the probation department acknowledging, in detail, his guilt in this case.

Over three months later, at the sentencing hearing, after having received disclosure of the presentence report and filing numerous objections thereto, the Court and the Government entered the hearing with approximately ten minutes notice of the subject motion. The motion itself and counsel's comments at the hearing indicated that the motion was being made upon explicit instruction and direction of the defendant to counsel, and was against counsel's advice.

A hearing on the motion was held in which the defendant and counsel were given free rein to pretty much say whatever they wanted to say in support of the motion. Because of the evidence adduced, (or lack thereof), and because of the reasons stated by the Court at the time, as well as the specific findings of fact and conclusions of law reduced to writing in this order, the motion was denied.

The decision of the district court to deny a motion to withdraw a plea of guilt will be disturbed only upon the showing of an abuse of discretion. The Fifth Circuit applies a totality of the circumstances test with a special eye to seven factors to decide whether a district court has abused its discretion under Federal Rule of Criminal Procedure 32. *United States v. Carr*, 740 F.2d 339, 343–44 (5th Cir.1984), *cert. denied*, 471 U.S. 1004, 105 S.Ct. 1865, 85 L.Ed.2d 159; *See also United States v. Bond*, 87 F.3d 695 (5th Cir.1996).

With the exception of last-minute claim of actual innocence, the defendant did not address any of the other six *Carr* factors.

The defendant complained about material submitted by Ole Anthony and the Trinity Foundation, a "televangelist watchdog group." The Court granted the defendant's motion to strike these materials and did not consider them at all in sentencing. The defendant next complained in this motion that Ole Anthony wished to testify at the sentencing hearing. Ole Anthony did not testify at the sentencing hearing, and would not have been allowed to do so unless there had been some indication that he had relevant evidence bearing on sentencing.

Next in the motion the defendant asserted as a reason for withdrawal of the plea that the government might adduce character witnesses when the government had indicated that they would not. At the sentencing hearing, the government adduced no witnesses, character or otherwise. In short, with the exception of the claim of innocence, (which will be examined in short order), the defendant articulated no justifiable reason for allowing withdrawal of the plea of guilt.

Before addressing the defendant's claim of innocence, the Court notes that to have allowed withdrawal of the plea of guilt in this case would have inconvenienced the Court, given the significant amount of work the Court had done in reviewing the presentence report, the voluminous objections thereto, the responses to those objections, as well as the bound volumes of character reference letters and other materials submitted by the defendant. This inconvenience factor was exacer-

---

1. After denial of this motion from the bench, the Court accepted the plea agreement, followed it and set Grant's sentence within the agreed-upon guideline range.

bated by the additional *Carr* factor of the delay in filing the motion. From a review of existing cases, the Court could find no other circumstance where the delay was as outrageous as in this case. Being handed a copy of the motion as you are literally putting your robe on before going into the courtroom for sentencing is a bit late. Given the delay and its attendant inconvenience on the Court because of all the work which had already been done in preparation for the sentencing, the Court must conclude that the Government likewise would have suffered the same inconvenience, waste of resources and prejudice had the motion been granted.

As previously stated, and as the plea colloquy will reflect, the original plea of guilt was without question knowing and voluntary. The defendant did not state anything to the contrary at the hearing on this motion. The defendant did not indicate that he was confused, that he was the victim of ineffective assistance of counsel, that he did not understand something, or that there was some defense that he had failed to assert.

At the hearing, one of his own character witnesses agreed with the characterization of him as "a sophisticated business man who takes care of his business." It is noted that this character witness was his banker who knew him in his financial life. The defendant is not some uneducated 18–year old who was naive about what was going on.

There was no allegation that at the time of the plea Mr. Grant was under any duress or coercion to plead guilty. Indeed, the case had been investigated for over 11 months with his knowledge. The Court notes that he was represented by counsel during the ongoing investigation. He specifically stated on the record, under oath, that he was not pleading guilty to protect anyone else and no one had threatened him, coerced him, or done any violence to him to get him to plead guilty. Additionally, he testified under oath that no one had promised him anything to get him to plead guilty except the promises contained in the plea agreement. Without question, his April 15 tax evasion plea was both knowing and voluntary.

The Court finds that to allow the withdrawal of the plea of guilt in this case would have wasted judicial resources. From the signed factual résumé to the sworn statements given by the defendant at the plea of guilt, and as will be demonstrated subsequently by a transcript of an undercover IRS videotape of the defendant, the evidence of the defendant's guilt is overwhelming. The review of the totality of the circumstances in this case indicates that because the defendant was indeed dead in the water is precisely why he pled guilty on April 15, 1996. To allow him at the eleventh hour to renege on the deal and compel a trial of several weeks would be to the detriment of those people on this Court's docket awaiting jury trial who are in fact innocent, as well as the numerous civil litigants who continually get bumped from their day in court because of the Speedy Trial Act and this Court's burgeoning criminal docket.

W.V. Grant, Jr. retained the counsel of his choice to represent and advise him in this matter. Defendant's counsel advised him throughout the course of this case, including investigation, during plea negotiations, during the presentence phase and ably represented him at the sentencing hearing and the hearing on the motion to withdraw his guilty plea. The Court found defendant's counsel to be effective. Mr. Grant's retained counsel advised against withdrawing the plea. However, the defendant persisted in his motion to withdraw the guilty plea. Mr. Grant had the close assistance of counsel.

At the hearing, when questioned about his claim of innocence, the defendant stated that "he felt in his heart that he was innocent." When continually pressed to articulate a reason as to why he was now claiming he was innocent after having sworn that he was guilty, the defendant could come up with no good answer, until finally in rambling testimony he stated, "Well, I thought it was a loan." This statement was incredible given the contents of the undercover IRS videotape of the defendant with a cooperating individual working with the IRS and the defendant's admission that not one dime had been paid back after some six years on this "loan."

This case arose after an investigation of the purchase of a $900,000 home by Mr.

Grant in 1989. In order to procure the loan, it appears that, in addition to committing tax fraud, he engaged in bank fraud by laundering some $100,000 in cash through the seller of the property to convert the funds to cashier's checks so that the title company would not report a large cash transaction to the IRS. Mr. Grant had to come up with an additional $100,000 as down payment to secure a loan and thus he took $100,000 in cash, caused it to be delivered to the seller in a brown bag, with the instructions that it be converted to cashier's checks. Once it was converted, it was deposited back into Mr. Grant's account and he wrote a check for the $100,000 at the closing. There is some question as to whether or not an additional $60,000 was likewise handled, but that is unimportant for the Court's analysis here.

The IRS began an investigation in 1995 of Mr. Grant's potential criminal tax liability through information that they had received. They contacted the seller of the property who disclosed the transaction to them and agreed to cooperate with the IRS. Mr. Grant was contacted and was informed that the Criminal Division of the Internal Revenue Service wanted to investigate this and several other transactions. He told them, through his lawyer, that he would get the information and get back with the IRS.

In the meantime, Mr. Grant called the cooperating individual, one Larry Cawthon, who had sold the $900,000 house to Mr. Grant in 1989. He agreed to a meeting. Unbeknownst to Mr. Grant at the time, this meeting was recorded for posterity on videotape, a technology with which Mr. Grant has some familiarity.

A copy of relevant portions of the transcript [2] of that videotape demonstrating Mr. Grant's guilt, his acknowledgment of his own guilt, as well as attempts that could only be characterized as obstruction of justice, are as follows:

> WVGRANT: Two weeks ago Tuesday, the IRS knocked on the door, and of course, they flashed badges. It's the criminal division. And I think what happened was my ex-wife told them a bunch of stuff. I'm pretty sure it was, because we were involved in, everything they asked about, stuff that she knew about.

> \* \* \* \* \* \*

> CI: [O]bviously, when you say IRS, you know, I don't want to be, I don't want to be pulled into something . . . .

> WVGRANT: I know you don't.

> CI: I wish it wasn't, my house wasn't one of your deals here, but uh . . . .

> WVGRANT: Just uh, maybe two things we want to explain, uh to make sure that whatever we say is the same thing that you're going to say. And uh, as far as we're concerned, this, this, even this meeting didn't happen because we made sure that we weren't being followed too, you know, just to be on the safe side, you know. We went out to two or three other places, had lunch with somebody, then we left, went up a couple of alleys and set there, you know, maybe we're being overly paranoid. I don't think you can be overly paranoid, do you?

> CI: I don't think so either.

> WVGRANT: [ . . . ] And we made sure when we called you to set up this meeting, it was on our car phone. You never know what's going on. So I don't . . . .

> CI: I tell you it can be pretty scary. [ . . . ]

> \* \* \* \* \* \*

> CI: [ . . . ] I know you remember, you know, you basically, as I remember this thing, you guys were having lunch over at that, what's that little Japanese or Chinese restaurant on Camp Wisdom Road?

> WVGRANT: probably.

> CI: Next to the Black–Eyed Pea there.

> WVGRANT: Ok.

> CI: And basically uh, what you said is look Larry, I need to come up with enough, show another $100,000 down payment here. If I give you cash . . . [ . . . ]

> CI: Ok. And I said, hey, no problem, as long as I've got the cash and so, Pug as I, yeah Pug, Pug and I met over at the restaurant. And Pug picked up a little

2. BGRANT is Brenda Grant, W.V. Grant, Jr.'s current wife and co-defendant.

brown bag that had a $100,000 cash in it, gave it to me, which scared the fool out of me because I thought I was going to get mugged going from there to my house.

WVGRANT: Ok. [ ... ]

CI: I went to, you know, my business associate, I went to my daughter and I basically got, like I remember four or five checks for you know, 20 ...

WVGRANT: I remember that.

BGRANT: Yeah.

CI: ... in the $20,000 range and ...

WVGRANT: I remember that, yeah.

CI: Ok. And so what I, when you gave me the cash, I just basically, you know, gave you those cashier's checks and then, of course, like my mother, I said, mother, obviously I was anxious to sell the house, I mean, you know, we were ... And I was, and we were both wanting to do whatever we could to make this deal happen, so I just told my mother, I said, look, I think I've got this thing sold. But I, can I for one day deal, borrow $20,000 here if I put the cash back into your account. Well, she said, no problem.

WVGRANT: Ok.

CI: I didn't even explain to her or anybody what we were doing 'cause I didn't think it was anybody's business. See, I never told Pug this.

WVGRANT: Good, that's good. I ...

CI: He doesn't know a thing. He doesn't know a thing about this.

WVGRANT: Good. Good. Fantastic.

CI: So, uh, and then I gave you the checks.

WVGRANT: Ok.

CI: I assumed you deposited them ... Is that right?

WVGRANT: Well, sure.... Sure, we deposited them.

CI: But the $100,000, is there a problem on that $100,000?

[ ... ]

WVGRANT: In our files for some reason we got $100,000 from you which is proba-bly *our* $100,000 you're talking about. (emphasis added).

* * * * * *

WVGRANT: [ ... ] Unless we figure out something else, we're in a heap of trouble if we say we gave you $100,000 in cash, you know.

CI: Well, I mean, so in other words, there's a problem with the money basical-ly.

WVGRANT: *Well, yeah, because that was money that, you know, just to be candid with you, that we hadn't paid taxes on, you know.* I mean, see uh ... At the time that my ex-wife and I got a divorce, I gave her $200,000 in cash. Of course, I can't prove that. But ... (Emphasis add-ed).

CI: No kidding.

WVGRANT: See, what I mean, in other words, over the course of our marriage we'd saved about $350,000 in cash, but I mean, that's just between us three, not going to leave the room. So I had, I had over $100,000 in cash myself. And uh, course I, I gave her $200,000 in cash plus I paid for her house and paid for her Mercedes and, gave her some oil paintings, gave her $1,000 a month in child support for several years.

[ ... ]

CI: Well, so, so, where do we go from here, I mean, what's ...

WVGRANT: I don't know ... Uh, we just thought that if, I guess if we came over here, that, that, God was going to work a miracle and there was another explanation that we hadn't thought of I guess. You know we're just kind of naive that way.

[ ... ]

WVGRANT: We were talking on the way over here, maybe we're just naive, I mean, this was, but we were wrong, but. As reading that, well maybe you loaned us the money to make the house deal go through and I asked her, I said, Where'd he get his money back, and she said maybe out of the

funding. You know that's just what ... But that was evidently wrong, you know.

CI: But see that just doesn't jive, see, with anything. I mean, all the closing statements, you know, $900,000, and you know Pug's commission and everything ...

WVGRANT: Right.

CI: ... is based on $900,000. So that doesn't wash, you know.

WVGRANT: I know it doesn't. But you know ...

CI: It doesn't pass the smell test.

WVGRANT: That's right. And we were just talking on the way over here, well, maybe he wanted to sell his house so much that he loaned us most of the down payment and then he got it back out of the funding or, which wouldn't wash, I guess, but still ... *So I guess we're in a heap of uh, trouble. Because every, everything we tried to think of has fallen through.* (emphasis added).

\* \* \* \* \* \*

WVGRANT: [ ...] So I told her, I said, *I don't know anything else to do except just tell our attorney that we're guilty and we'd like to not go through a big investigation, but.* Whatever they think we owe, *we'll just plead guilty and do a plea bargain* and if, if I go to jail for whatever time that we ...

CI: Oh, that's a bad word.

WVGRANT: Sure, it is.

BGRANT: Well, that's where it's going to end up though.

WVGRANT: Because, it's not just civil, it's criminal. But uh, I think that's it's really important that we not let them get in these files. Just say, we're sorry, we just don't have any files, they got destroyed, whatever. I don't know what we'll do. Because I don't, I don't want to involve anybody else and have them come knock on your door, knock on somebody else's door.

CI: Boy, I don't know.

WVGRANT: And if you have any creative ideas, let us know. I don't, I know, I'm fresh out of them. But ...

CI: No, that's ...

WVGRANT: ... [I]f we could explain the down payment then, we're home free. 'Cause, that's all they want to see, then they'll go away. And he thinks they'll go away like they did Bob Tilton without involving anybody who was ever involved with him. But uh ...

CI: Well, I don't know how, I don't know how you'd explain it though.

WVGRANT: I'm not as big as Bob Tilton, but still they'd like to make an example.

\* \* \* \* \* \*

CI: I'm sorry this whole thing is happening like this.

WVGRANT: I know it is, I know you are.

BGRANT: Well, we should have really ...

WVGRANT: Been smarter.

\* \* \* \* \* \*

CI: [ ...] And that stuff, that came out on television here about you and your friend, Tilton, here, that had to dramatically hurt business, didn't it?

WVGRANT: [ ...] Well, we've been hit about four times. Our church builds back up to about 50 people [a] Sunday. We'll get it built about second. We'll get up to about 3,500 people some Sundays, then we'll take a hit from Channel 4 and fall back down to 1,500. Then we'll build it back up ... [ ...] Yeah. And then we build it back up over six months, take a hit from Inside Edition, it falls back down to 1,500 or 2,000.

BGRANT: We have a core of about 300 that no matter what happens.

WVGRANT: They'll be with us. But people choose to believe what the news media says and it's been proven, they make up a lot of news, you know. The GM truck thing, you know how they ...

CI: Right.

WVGRANT: They did that on Day One.... And they planted explosives. They finally, you know, Day One.

CI: Oh, that's right.

WVGRANT: Day One had to apologize. CBS claimed that this pollution caused all these fish to die. Then they got exposed and CBS came back and said well, no we

shocked the fish for effect. And it was ABC that showed that spy, John Block, US spy, John Block, give somebody a brief-case. Then they got exposed, they said no, that was just an actor we hired. You know, they're always trying to beat each other in the ratings. And the news media's like a monster that has to be fed. And if there's not an OJ thing going on . . .

CI: Oh, it's going to be something else.

WVGRANT: If it's not the Persian Gulf War going on or Oklahoma City thing going on, they're going to get after some preacher. 'Cause they have to do it every single day, they have to come up with news.

CI: Mm-hmm.

WVGRANT: And it's I mean, the mainline media is bad enough, but the tabloids are on every night. Inside Edition, Hard Copy, Current Affair, and they have to come up with two or three stories every single night. And they're always on . . . *But still that doesn't excuse what we've done here.* (emphasis added).

The *Carr* decision and its progeny teach that without question a claim of innocence alone is far from being sufficient to overturn denial of a withdrawal motion. Otherwise, the mere assertion of legal innocence would always be a sufficient condition for withdrawal, and withdrawal would effectively be an automatic right. Such is the case here. Considering the totality of the circumstances in this case, which includes the undercover IRS videotape of the defendant and the cooperating individual, the signed plea agreement and signed factual résumé, the defendant's sworn responses to questions at the plea colloquy calculated to determine his guilt and factual support therefore, as well as the voluntariness of his plea, his knowledge of the consequences thereof, his statements to the probation officer during the presentence process concerning his guilt, his statements during the hearing on this motion, and the total lack of any evidence in support of legitimate factors that would indicate a withdrawal of the plea to be proper, his motion to withdraw is **DENIED,** and the Judgment and Commit-

ment Order in this case will be signed this date as well.

**SO ORDERED.**