**HUNT OIL COMPANY, et al.,
Petitioners,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.**

**No. 87–4550.**

United States Court of Appeals,
Fifth Circuit.

Sept. 6, 1988.

---

**34.** 839 F.2d 1075 (5th Cir.1988).

**35.** *Id.* at 1085.

**36.** *Id.* at 1084.

Jon L. Brunenkant (argued), Washington, D.C., Gerald Bendo, Hunt Oil Co., Dallas, Tex., for Hunt Oil Co.

Stephen L. Teichler (argued), Charles M. Darling, IV, John P. Babb, Washington, D.C., John Chapman, Houston, Tex., for Pennzoil Co.

Sherman S. Poland, Ross, Marsh & Foster, Washington, D.C., for Logue & Petterson, Inc.

Charles M. Darling, IV, Baker & Botts, Washington, D.C., Kris Terry, Dallas, Tex., for Fina Oil & Chemical Co.

Jon L. Brunenkant, George C. Garikes, Washington, D.C., William T. Behnam, Amoco Corp., Chicago, Ill., for Amoco Production & Marathon Oil.

Charles F. Hosmer, Jr., Arco Oil & Gas Co., Dallas, Tex., Jon L. Brunenkant, George C. Garikes, Washington, D.C., for Arco Oil & Gas.

Doug Rasch, C. Roger Hoffman, Houston, Tex., Charles M. Darling IV, Stephen L. Teichler, Washington, D.C., for Exxon Corp.

Glen S. Howard, Gail S. Gilman, Washington, D.C., for M.D. Abel Co.

Jerome Feit, Solicitor, Federal Energy Reg. Comm., Joel M. Cockrell, Atty. (argued), Washington, D.C., for respondent.

Before CLARK, Chief Judge, GARZA and JOHNSON, Circuit Judges.

CLARK, Chief Judge:

Like the proverbial bad penny, the instant dispute is back in our Court again. As before, the petitioners are primarily certain natural gas producers and other intervenors [1] (the producers) who seek review of two orders [2] of the Federal Energy Regulatory Commission (the Commission) which involve a case specific application of third-party protest procedures adopted by the Commission in the "Order 23 Series." [3] The procedures outlined in the Order 23 series were subsequently affirmed in part and modified in part by this Court in *Pennzoil Co. v. FERC*, 645 F.2d 360 (5th Cir. 1981), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982) (*Pennzoil I*). In *Pennzoil Co. v. FERC*, 789 F.2d 1128 (5th Cir.1986) (*Pennzoil II*), this Court vacated and remanded two orders [4] by the Commission sustaining certain third-party protests to the producers' assertion of contractual authority to collect the rates for stripper well gas established under section 108 of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3318. On remand from *Pennzoil II*, the Commission dismissed some of the third-party protests it had previously sustained, but continued to sustain the third-party protests as to two specific types of area rate clauses contained in the contracts between United Gas Pipeline Co. (United) and the producers. Because the Commission, in sustaining the third-party protests, failed to properly apply this Court's decision in *Pennzoil II*, we grant the petitions for review, vacate the agency orders as to

1. Petitioners and intervenors include: Pennzoil Co., Amoco Production Co., Arco Oil & Gas Co., Exxon Corp., Fina Oil and Chemical Co., Hunt Oil Co., Logue and Patterson, Inc., and Marathon Oil Co.

2. Order on Remand, United Gas Pipe Line Co., Docket No. GP80–41–035, 37 F.E.R.C. (CCH) ¶ 61,249 (Dec. 12, 1986); Order on Rehearing of Order on Remand, United Gas Pipe Line Co., Docket Nos. GP80–41–036, –037, and –038, 40 F.E.R.C. (CCH) ¶ 61,062 (July 23, 1987).

3. Order No. 23, 6 F.E.R.C. (CCH) ¶ 61,229 (March 13, 1979); Order on Rehearing of Order No. 23, 7 F.E.R.C. (CCH) ¶ 61,152 (May 11, 1979); Order No. 23–A, 7 F.E.R.C. (CCH) ¶ 61,247 (June 12, 1979); Order No. 23–B, 7 F.E.R.C. (CCH) ¶ 61,279 (June 21, 1979); Order on Rehearing of Order No. 23–B, 8 F.E.R.C. (CCH) ¶ 61,130 (August 6, 1979); Order on Rehearing of Order No. 23–A, 8 F.E.R.C. (CCH) ¶ 61,158 (August 13, 1979).

4. Opinion 181, United Gas Pipe Line Co., Docket No. GP80–41–000, 24 F.E.R.C. (CCH) ¶ 61,083 (July 19, 1983); Opinion 181–A, United Gas Pipe Line Co., Docket Nos. GP80–41–002, *et al.*, 27 F.E.R.C. (CCH) ¶ 61,199 (May 7, 1984).

type I clauses, and, hopefully, terminate this controversy.

## I. FACTS AND PROCEDURAL HISTORY

### A. Background

Pursuant to Order 23 issued by the Commission in 1979,[5] area rate clauses [6] may be used by producer-sellers and pipeline-purchasers to authorize the escalation of rates for natural gas to the higher rates established in the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301–3432 (NGPA). This Court has previously discussed the history and interrelationship of area rate clauses and federal natural gas regulation in *Pennzoil I*, 645 F.2d at 365–71, and *Pennzoil II*, 789 F.2d at 1132.[7] Therefore, we need not repeat that discussion here, except as relevant to the procedures established by the Commission for determining whether an area rate clause in a specific contract authorizes the collection of NGPA rates.

After the enactment of the NGPA, the Commission confronted the difficult question of whether producer-sellers and pipeline-purchasers could use existing area rate clauses to authorize the escalation of rates to those set in the NGPA. In resolving this issue, the Commission opted for a case specific approach of ascertaining the contracting parties' intent, rather than issuing a dispositive ruling that all area rate clauses did or did not authorize the collection of NGPA rates. Summarizing the Commission's approach to this issue, the *Pennzoil II* Court stated:

> In Order 23, the Commission concluded that neither the language of the NGPA nor Commission regulations precluded authorization of NGPA rates through area rate clauses. Nevertheless, the Commission also concluded that it could not dispositively construe all such area rate clauses. Rather, the Commission concluded that it would ascertain and give effect to the contracting parties' intent and that it would not object generally to the parties' reliance on area rate clauses as authority to collect NGPA prices.

*Pennzoil II*, 789 F.2d at 1132. Thus, the focal point for the Commission's analysis in determining whether a particular area rate clause authorizes NGPA rates is the contracting parties' intent which is to be ascertained on a case-by-case basis.

Recognizing that area rate clauses do not in all instances authorize the collection of NGPA rates merely because the contracting parties assert that it was their mutual intent to collect such rates, the Commission

5. *See supra* note 3.

6. An "area rate clause" is a specific type of price escalation provision permitting "a change in price to the applicable just and reasonable area ceiling rate which has been, or which may be, prescribed by the Commission for the quality of the gas involved." 18 C.F.R. § 154.93(b–1).

7. When Congress adopted the NGPA on November 9, 1978, Congress restructured federal natural gas regulation by providing for congressionally set rates promulgated by statute. Initially, the Commission set rates by following an individual cost of service formula, which was later exchanged for an area by area rate approach and ultimately, for the use of nationwide rates of general applicability. *See In re Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Shell Oil Co. v. FPC*, 520 F.2d 1061 (5th Cir.1975), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2661, 49 L.Ed.2d 394 (1976).

Prior to the enactment of the NGPA, federal natural gas regulation existed pursuant to the Natural Gas Act, 15 U.S.C. § 717–717w (NGA).

Under the *Mobile–Sierra* doctrine, producer-sellers and pipeline-purchasers were required to contractually authorize a rate increase before obtaining such an increase under section 4 or 5 of the NGA. *See United Gas Pipe Line Co. v. Memphis Light, Gas and Water Div.*, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed.2d 153 (1958); *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956); *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956). *See also Pennzoil II*, 789 F.2d at 1132. As noted by the Court in *Pennzoil II*, over the years, producer-sellers and pipeline-purchasers relied on various indefinite price escalator clauses in their contracts to escalate their rates to new rates as those rates were set by the Commission. *Pennzoil II*, 789 F.2d at 1132. At the time the Commission shifted from an area rate approach to nationwide rates of general applicability, the Commission permitted the use of a certain type of indefinite price escalator clause referred to as an area rate clause to authorize the increase of contract prices to the national ceiling rates. *Id. See also Pennzoil I*, 645 F.2d at 365–71.

issued Order 23–B which established procedures for interstate pipelines and certain third-party protestors to protest the producers' assertion of contractual authority to collect the higher NGPA rates.[8] *Id.* at 1132–33. In accordance with the bifurcated procedure for third-party protests set forth in Order 23–B, if the contracting parties submit that it was their mutual intent to authorize the NGPA rates, then,

> [T]he Chief ALJ [administrative law judge] summarily dismisses the third-party protests unless (1) the contractual language is inconsistent with the parties' mutual interpretation, *or* (2) the protestor submits other specific evidence that explains or modifies the text of the contract. If either of these two requirements is met, an evidentiary hearing before another ALJ is scheduled.

*Id.* at 1133 (citation omitted) (emphasis added). In short, if the contracting parties assert that their mutual intent is to collect the NGPA rates, a rebuttable presumption is created in favor of the contracting parties' interpretation (Order 23 presumption). The third-party protestor then has the burden of coming forward with substantial evidence of lack of contractual authority to overcome the presumption that the contracting parties' assertion regarding their mutual intent is accurate. If the protestor fails to meet this burden, the protest is summarily dismissed on the basis of the Order 23 presumption; however, if the protestor satisfies the burden of coming forward by pointing to contractual language inconsistent with the parties' asserted intent *or* by submitting contradicting extrinsic evidence, the contracting parties then bear the burden of persuasion at an evidentiary hearing before another ALJ to establish by a preponderance of the evidence

that the asserted contractual authority to collect the higher NGPA rates does in fact exist. *Pennzoil II,* 789 F.2d at 1133; *Pennzoil I,* 645 F.2d at 370.[9]

As noted in *Pennzoil II,* this Court essentially affirmed the Commission's Order 23 procedures in *Pennzoil I.* The *Pennzoil II* Court also recognized that despite the application of the Order 23 procedures to the interpretation of such clauses, "the *Erie* doctrine[10] required the Commission to apply state law principles of contract construction rather than general principles of contract construction developed by the Commission." *Pennzoil II,* 789 F.2d at 1133 (footnote omitted). *See also Pennzoil I,* 645 F.2d at 383–84.

### B. *The United Contracts*

The instant case involves the case specific application of the third-party protest procedures adopted by the Commission in the Order 23 series to the interpretation of area rate clauses contained in contracts between United and the producers. This dispute, involving approximately 365 natural gas producers and 775 contracts, originated on August 27, 1979, when United filed an evidentiary submission pursuant to 18 C.F.R. § 154.94(j) representing that the contracting parties mutually intended to authorize the collection of all NGPA rates through the use of area rate clauses in the contracts.[11] Subsequent to United's filing, third-party protests to United's submission of the contracting parties' mutual intent were filed in October 1979 by certain non-parties to the contracts, including the Commission staff, Associated Gas Distributors, and Gulf States Utilities Company.

Applying the Order 23 presumption to the contracting parties' assertion of mutual intent, the Chief ALJ summarily dismissed

---

**8.** Third-party protestors often include such groups as the Commission staff, state regulatory commissions, local distribution companies, and consumer groups. *Pennzoil I,* 645 F.2d at 370.

**9.** The rebuttable presumption attaching to the contracting parties' assertion of mutual intent by virtue of Order 23–B does not similarly apply to protests filed by interstate pipelines. In such cases, since there is no agreement concerning the intent of the parties, the burden of going forward and the burden of persuasion is at all

times on the producer-seller as the party seeking the rate increase. *Pennzoil II,* 789 F.2d at 1133 n. 12; *Pennzoil I,* 645 F.2d at 370.

**10.** *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**11.** United supplemented this submission on November 11, 1979, December 31, 1979, and July 25, 1980.

the majority of the protests on the basis that the protestors failed to rebut the presumption; however, as to the contracting parties' authority to collect NGPA prices for stripper well gas,[12] the Chief ALJ concluded that the protestors submitted sufficient extrinsic evidence to rebut the Order 23 presumption and to obtain an evidentiary hearing on the parties' intent regarding the stripper well rates.[13] To rebut the contracting parties' assertion of mutual intent, the protestors relied on a letter from United to its producers, dated April 23, 1979, stating essentially that United believed that its contracts did not require the payment of NGPA stripper well rates. To support its position that the area rate clauses did not authorize the collection of NGPA rates for stripper well gas, United reasoned that the rate of production from a well had never been intended by the parties to be a criterion for determining rates.[14] United subsequently retracted the April letter in August 1979; nevertheless, the Chief ALJ, addressing the April 23 letter in the context of Order 23, remarked:

Indeed, more reliable and probative evidence of United's intent not to collect NGPA rates for stripper well gas would be hard to find. Clearly, Protestors' extrinsic evidence squarely meets the burden imposed by the second tier of the Commission's two-tiered test outlined above in Opinion No. 77. Accordingly, the Chief Administrative Law Judge will establish further proceedings to probe the contracting parties' intent with respect to stripper well ceiling prices.

12 F.E.R.C. at 65,115 (footnote omitted). Accordingly, the Chief ALJ assigned the case to another ALJ (the presiding ALJ) to conduct an evidentiary hearing on the factual question of the contracting parties' intent to authorize the collection of the NGPA stripper well rates through the use of area rate clauses.

Later, at the evidentiary hearing, the presiding ALJ considered live testimony, deposition testimony, and documentary evidence of the contracting parties' intent.[15]

---

**12.** Section 108 of the Natural Gas Policy Act of 1978, 15 U.S.C. § 3318(b) defines "stripper well gas" in the following terms:
 (1) General rule.—Except as provided in paragraph (2), the term "stripper well natural gas" means natural gas determined in accordance with section 3413 of this title to be nonassociated natural gas produced during any month from a well if—
 (A) during the preceding 90–day production period, such well produced nonassociated natural gas at a rate which did not exceed an average of 60 Mcf per production day during such period; and
 (B) during such period such well produced at its maximum efficient rate of flow, determined in accordance with recognized conservation practices designed to maximize the ultimate recovery of natural gas.

**13.** Initial Decision Dismissing in Part Third Party Protests," United Gas Pipe Line Co., Docket No. GP80–41, 12 F.E.R.C. (CCH) ¶ 63,038 (August 28, 1980). The Commission eventually affirmed this summary dismissal. *See* Opinion No. 135, 17 F.E.R.C. (CCH) ¶ 61,232 (1981) (remanding the decision of the Chief ALJ, along with twenty-six other initial decisions, which summarily dismissed protests); Transcontinental Gas Pipe Line Corp., Docket No. GP80–24, 24 F.E.R.C. (CCH) ¶ 63,101 (1983) (reaffirming initial decision on remand); Opinion No. 215, Transcontinental Gas Pipe Line Corp., Docket No. GP80–24, 27 F.E.R.C. (CCH) ¶ 61,180 (1984) (affirming decision of Chief ALJ on remand),

rehearing denied, Opinion No. 215–A, 28 F.E.R.C. (CCH) ¶ 61,018 (1984), aff'd, *Associated Gas Distributors v. FERC*, 810 F.2d 226 (D.C.Cir. 1987).

**14.** The April 23 letter from United stated in pertinent part:
 At the time that existing contracts containing area rate clauses were executed, the rate of production from a well was not a criterion in determining a category of gas, and United believes that the parties did not intend that the area rate clause would be triggered by a rate for a category of gas determined by the rate of production from a well. *Therefore, United believes that the area rate clause is not contractual authority for paying the rate prescribed by Section 108 of the NGPA.*
 (emphasis added).

**15.** As the *Pennzoil II* Court noted, the presiding ALJ, in interpreting the language of the contracts, utilized the guidelines in Opinion No. 77 for interpreting contracts if the contracting parties disagreed over intent. *See* Opinion No. 77, Independent Oil and Gas Assoc. of West Virginia, Docket Nos. R174–188 & R175–21, 10 F.E.R.C. (CCH) ¶ 61,214 (March 4, 1980), *petitions for review dismissed without prejudice, Pennzoil Co. v. FERC*, 645 F.2d 394 (5th Cir.1981). *See also Pennzoil Co. v. FERC*, 742 F.2d 242 (5th Cir.1984) (connected case). Like the Court in *Pennzoil II*, we decline to review the validity of the recharacterization of the Order 23 presump-

After hearing this evidence, the presiding ALJ, at the suggestion of the Commission staff, grouped the area rate clauses at issue into eight distinct types. Construing the language of the clauses with the extrinsic evidence offered at the hearing, the presiding ALJ concluded that the majority of the types of area rate clauses (types II, III, V, VI, VII, and VIII) authorized the collection of the NGPA rate for stripper well gas. As to clauses types I and IV, however, the presiding ALJ determined that such clauses did not authorize the collection of NGPA stripper well rates.[16]

Thereafter, in Opinion 181 and Opinion 181–A, the Commission reversed the presiding ALJ's decision as to clauses types II, III, V, VI, and VII, concluding that the producers had failed to meet their procedural burden of demonstrating by a preponderance of extrinsic evidence that the contracting parties intended to authorize collection of NGPA rates for stripper well gas. In reversing the presiding ALJ, the Commission stated numerous times that the parties' assertion of mutual intent to collect NGPA prices had been negated by the April 23, 1979, letter of United.[17] Thereafter, the producers appealed the Commission's decision.

In *Pennzoil II*, this Court reversed the Commission's decisions in Opinion 181 and Opinion 181–A, concluding that the Commission erred in its reversal of the presiding ALJ's decision primarily due to a misapprehension of the nature and effect of the Order 23 presumption. *Pennzoil II*, 789 F.2d at 1136. Specifically, this Court determined that the Commission erred in its application of the Order 23 presumption by (1) failing to give any further evidentiary weight to the parties' assertion of mutual intent after the Order 23 presumption was rebutted; (2) giving undue weight to the rebuttal evidence, the letter of April 23, 1979; and (3) failing to give evidentiary weight to the language of the contracts

and thus, erroneously refusing to construe the contracts involved in the proceeding. *Id.* at 1137. Further, the *Pennzoil II* Court determined that the Commission erred in refusing to give proper weight to the credibility determinations of the presiding ALJ and in failing to properly apply state law to the language of the contracts. *Id.* at 1136, 1141–45.

On remand from *Pennzoil II*, the Commission issued an order and an order on rehearing, concluding that clauses types I and IV do not authorize the collection of NGPA rates for stripper well gas.[18] In its orders, the Commission specifically adopted the presiding ALJ's initial decision, including the findings and conclusions of the presiding ALJ contained in that decision. The Commission reasoned that were it not for its previous misapprehension of the Order 23 presumption, the decision in Opinions 181 and 181–A would be error free. In this regard, the Commission stated on remand:

> Once the operation of the presumption and its rebuttal is so clarified, no impediment remains to the adoption of the presiding ALJ's analysis. The ALJ, as the court indicated, is in the best position to gauge the credibility of the witnesses and the testimony presented at hearing. Moreover, his analysis of the contract language is fully in conformance with the Opinion No. 77 standards, and, as the court described it, is "eminently reasonable." Since only the misapprehension of the burden-shifting effected by the rebuttal of the Order No. 23 presumption initially inhibited the Commission from adoption of the [presiding] ALJ's contract analysis, his contract construction and credibility determinations will be utilized on remand.

Order on Remand, 37 F.E.R.C. at 61,630. The producers now seek review of the Commission's orders sustaining the third-party

tion set forth by the Commission in Opinion No. 77. *See Pennzoil II,* 789 F.2d at 1139 n. 27.

**16.** "Initial Decision Interpreting Contracts Containing Area Rate Clauses," United Gas Pipe Line Co., Docket No. GP80–41–000, 20 F.E.R.C. (CCH) ¶ 63,050 (Aug. 24, 1982).

**17.** *See* Opinion No. 181, 24 F.E.R.C. at 61,218, 61,219 & n. 6, 61,221; Opinion No. 181–A, 27 F.E.R.C. at 61,371.

**18.** *See supra* note 2.

protests as to clauses types I and IV.[19] Having concluded that the Commission failed to follow the guidelines set forth by this Court in *Pennzoil II*, we grant the producers' petitions for review. Accordingly, we will vacate the Commission's orders as to clause type I and remand with directions to enter a final order on type I clauses consistent with this opinion without a third remand to the Commission.

## II. DISCUSSION

### A. *Collateral Estoppel*

■ Initially, the producers contend that the Commission is barred on the basis of collateral estoppel from concluding that the type I area rate clauses do not authorize the collection of NGPA rates for stripper well gas. In making this contention, the producers rely primarily on the conclusion of the Chief ALJ, in his decision dismissing the majority of the third-party protests, that none of the protested contracts contain any language expressly excluding the collection of statutory rates under the NGPA. The producers then argue that, because the Chief ALJ's conclusion was affirmed by the Circuit Court for the District of Columbia in *Associated Gas Distributors v. FERC*, 810 F.2d 226 (D.C.Cir.1987), the issue as to the collection of stripper well rates under the NGPA pursuant to the area rate clauses in the United contracts was finally determined; therefore, the Commission is barred from redetermining that issue on the basis of collateral estoppel. After reviewing the Chief ALJ's decision, we conclude that the producers' contention in this regard is fundamentally flawed as the Chief ALJ specifically reserved the issue of the contracting parties' intent to collect NGPA rates for stripper well gas to be resolved by another ALJ after an evidentiary hearing.

In *Hibernia National Bank v. United States*, 740 F.2d 382, 387 (5th Cir.1984), this Court listed the three traditional requirements for the application of the doctrine of collateral estoppel: (1) the issue to be concluded must be identical to that involved in the prior action; (2) in the prior action the issue must have been "actually litigated"; and (3) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment. Further, "[c]ollateral estoppel operates to bar in any future lawsuit the relitigation of an issue of ultimate fact by the party against whom the issue is determined by a valid and final judgment." *Id.* (citation omitted).

Applying the requirements of the doctrine of collateral estoppel to the facts of the instant case, our analysis need not proceed any further than the first requirement of identity of issues to determine that the producers' contention is without merit. In his opinion dismissing the majority of the third-party protests to the United contracts, the Chief ALJ concluded that none of the contested area rate clauses specifically *exclude* the collection of NGPA rates. Contrary to the producers' assertion, the above conclusion by the Chief ALJ does not hold that the parties contracted to collect all NGPA rates under all of the area rate clauses. As noted earlier, once the contracting parties assert it was their mutual intent to collect NGPA rates pursuant to Order 23–B, the Chief ALJ summarily dismisses the third-party protest unless there exists either inconsistent contractual language *or* contradictory extrinsic evidence. By concluding that none of the area rate clauses excluded the collection of NGPA rates, the Chief ALJ merely applied the first tier of the Order 23–B analysis addressing the question of the existence of inconsistent contractual language. On this first tier, the third-party protestors did not prevail as the Chief ALJ did not conclude the contract language affirmatively excluded NGPA rates. However, as to the second tier of the Order 23–B analysis which inquires into the existence of any extrinsic

**19.** While initially appealing the Commission's decision as to both clauses types I and IV, the producers now only contest the Commission's decision sustaining the third-party protest to the type I clause. The producers' decision not to appeal the Commission's ruling on the type IV clause appears to be prompted by the fact that the type IV clause is contained only in a contract between United and Texaco. Since Texaco has sought neither rehearing nor review of the Commission's orders on remand, a fact admitted by the producers at oral argument, we decline to review the Commission's decision as to the type IV clause.

evidence contradicting the contracting parties' mutual intent, the Chief ALJ found that, as to NGPA stripper well gas rates, the third-party protestors satisfied their procedural burden of going forward with sufficient extrinsic evidence—the April letter of United—to warrant an evidentiary hearing on the issue of the parties' intent. Thus, the Chief ALJ's decision and the later *Associated Gas* decision affirming the Chief ALJ addressed only the contracting parties' intent to collect NGPA rates, other than NGPA rates for stripper well gas. The procedural issue resolved by the Chief ALJ, whether the contractual language was inconsistent with the parties' assertion of mutual intent so as to rebut the Order 23 presumption, is not identical to the factual issue resolved by the Commission, whether the parties intended to contractually authorize the collection of section 108 NGPA rates for stripper well gas; thus, the doctrine of collateral estoppel does not apply to bar the Commission from concluding that the contracting parties did not authorize the collection of section 108 NGPA rates for stripper well gas.[20]

### B. *The Contracting Parties' Intent*

### 1. *Pennzoil II*

■ Since the producers raise several arguments asserting that the Commission failed to comply with this Court's decision in *Pennzoil II*, we briefly mention some of the guidelines established in *Pennzoil II* for ascertaining the contracting parties' intent to collect NGPA rates once the Order 23 presumption has been rebutted by third-party protestors. Initially, the Order 23 presumption in favor of the contracting parties' mutual interpretation of their contractual intent imposes on the party against whom the presumption is directed (the third-party protestor) the burden of going forward with substantial evidence to rebut or meet the presumption, but does not shift the burden of persuasion. *Pennzoil I*, 645 F.2d at 392; *Pennzoil II*, 789 F.2d at 1136. *Pennzoil II* further clarified the concept of the Order 23 presumption by explaining that the Court adopted the "bursting bubble" or Thayer theory of presumptions, instead of the Morgan theory of presumptions, when it affirmed the Order 23 presumption in *Pennzoil I*. *Pennzoil II*, 789 F.2d at 1136. Pursuant to the "bursting bubble" or Thayer theory of presumptions, "the *only* effect of a presumption is to shift the burden of producing evidence with regard to the presumed fact." *Id.* (footnote omitted) (emphasis in original).[21] Once the protestor produces evidence challenging the presumed fact—the contracting

---

**20.** In attempting to invoke the bar of collateral estoppel, the producers characterize the issue referred by the Chief ALJ to the presiding ALJ for an evidentiary hearing as one resolving the contracting parties' intent concerning volumetrically based rates, rather than the parties' intent as to statutory rates. The producers contend that the statutory aspect of the section 108 NGPA rate for stripper well gas was finally resolved by the Chief ALJ in his decision summarily dismissing the majority of the third-party protests, but that the volumetric aspect of the section 108 NGPA rate was not resolved by the Chief ALJ; rather, the volumetric aspect was referred to the presiding ALJ for a factual determination. However, the express language of the Chief ALJ's decision contradicts the producers' characterization of the issue submitted to the presiding ALJ. Specifically, the Chief ALJ stated that "[p]rotestors have submitted extrinsic evidence ... which directly contradicts United's present position that its contracts authorized NGPA rate collection ... Accordingly, the Chief Administrative Law Judge will establish further proceedings to probe the contracting parties' intent with respect to stripper well ceil-

ing prices." 12 F.E.R.C. at 61,115 (footnotes omitted). At no point in his decision does the Chief ALJ mention the volumetric aspect of the section 108 NGPA rate for stripper well gas. We decline to engraft such a distinction on the Chief ALJ's opinion.

**21.** Indeed, it was an incorrect perception of the type of theoretical approach to the Order 23 presumption which prompted this Court in *Pennzoil II* to remand the Commission's decision. The Commission had propounded that the proper theory of presumptions to be applied to the Order 23 presumption was the Morgan theory which imposes on the party against whom the presumption is directed the burden of proving that the nonexistence of the presumed fact is more probable than its existence. 10 J. Moore, H. Bendix, M. Waxler, D. Epstein, K. Harper & G. Grotheer, *Moore's Federal Practice* § 301.04[2], at III–19 (2d ed. 1988) (quoting Morgan, *Instructing the Jury Upon Presumptions and Burden of Proof*, 47 Harv.L.Rev. 59 (1933)). As noted by the *Pennzoil II* Court, Morgan's theory was rejected by this Court in *Pennzoil I* and by Congress in its adoption of Fed.R.Evid.

parties' assertion of mutual intent, the Order 23 presumption "bursts" or is eliminated from the analysis. Significantly, it is only the presumption which disappears, not the evidence supporting that presumption which, in the Order 23 context, is the parties' assertion of mutual intent to collect NGPA rates and their various exchanges and assertions.

■ After the protestor dispels the Order 23 presumption, an evidentiary hearing is conducted to probe the contracting parties' intent. The Commission is then "obligated to construe the contracts to determine whether they authorize NGPA rates or not, taking into account the language of the contracts and *all* the extrinsic evidence of intent presented, including the parties' assertion of mutual intent." *Id.* at 1141 (emphasis in original). Further, in construing the contracts to ascertain the parties' intent, the presiding ALJ was to apply "the law that would govern the parties' dealings were there no regulation at all of the contract's subject matter." *Id.* at 1142 (quoting *Pennzoil I,* 645 F.2d at 387 (footnote omitted)). In this regard, the Commission is entitled to assume that a specific state's contract law is the same as general contract principles, including the principles espoused in the Uniform Commercial Code ("U.C.C.").

Finally, in reviewing the Commission's decision on the parties' intent, the factual determinations of the Commission are to be sustained if supported by "substantial evidence." *Pennzoil II,* 789 F.2d at 1135. *See* 15 U.S.C. § 3416. Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). In making its factual determinations after the presiding ALJ's initial resolution of the parties' intent, the Commission, while not strictly bound by the ALJ's credibility determinations, is to afford the credibility findings of the ALJ

special weight and such findings are not to be easily ignored. *Id.; Mattes v. United States,* 721 F.2d 1125, 1129 (7th Cir.1983); *Kirkland v. Railroad Retirement Board,* 706 F.2d 99, 104 (2d Cir.1983). As to legal conclusions, this Court freely reviews such questions of law and is not obliged to accord any deference to the agency's determinations. *Pennzoil II,* 789 F.2d at 1135.

In addition to setting forth these general principles in *Pennzoil II* regarding the application of the Order 23 presumption, this Court noted several errors made by the Commission regarding the application of state law to the interpretation of the contracts. Those errors and the directions of the *Pennzoil II* Court regarding the application of state law to the contracts will be discussed later in this opinion.

### 2. *The Mutual Intent of the Parties*

The producers contend that the Commission departed from the principles of *Pennzoil II* by failing to give adequate evidentiary weight to the contracting parties' assertion of mutual intent and by giving undue evidentiary weight to the language of the contracts. Specifically, the producers contend that the Commission, perceiving a basic inconsistency between the language of the type I area rate clauses and the parties' averment of intent, rejected the extrinsic evidence of intent in toto and based its conclusion to sustain the third-party protests to the type I clauses exclusively on what the Commission devised to be the "plain meaning" of the words of the area rate clauses. Since the Commission adopted the presiding ALJ's analysis in this regard on remand, we look to the presiding ALJ's decision to determine if the producers are correct in their assertion. In this respect, we note that the instant contention made by the producers primarily finds fault with the presiding ALJ's approach to resolving the factual inquiry of the parties' intent, an approach which this Court has previously found to be an eminently reasonable and practical approach to this mammoth proceeding which "might serve

---

301. *See generally Pennzoil II,* 789 F.2d at 1137–39.

as a model on remand." *Pennzoil II*, 789 F.2d at 1145 n. 44.

Turning to the presiding ALJ's description of the method of discerning the parties' intent, we find that the presiding ALJ initially concluded that the plain meaning of the language of the type I area rate clauses supports a construction that the contracting parties did not authorize the collection of NGPA rates; however, he further stated: "the fact that a price escalator clause speaks only of rates established by agency action does not necessarily mean that the parties intended to exclude statutory rates." Opinion No. 77, 10 F.E.R.C. at 61,401. Accordingly, the presiding ALJ reasoned that Opinion No. 77 required that the contract language be examined in conjunction with the contracting parties' assertion of mutual intent to collect NGPA rates, the extrinsic evidence submitted by the third-party protestors and the producers, and the regulatory setting in which the parties executed the contracts.

Extrinsic evidence of the parties' intent adduced at the evidentiary hearing before the presiding ALJ included the April 23 letter of United to the producers to the effect that the area rate clauses did not authorize NGPA rates for stripper well gas, the August letter of United retracting the April 23 letter, and testimony by the producers of their consistently voiced position that they were entitled to the highest legal price for their natural gas. Additionally, course of performance evidence regarding United's refusal to pay NGPA rates for stripper well gas during the period between its April and August letter was introduced, as was course of performance evidence to the effect that United consist-

ently paid the highest legal price for gas prior to the April letter and subsequent to its August retraction. Finally, the presiding ALJ examined the regulatory atmosphere surrounding the execution of the contracts at issue, noting that the contracts were executed at a time prior to the passage of the NGPA when no national area rate existed. The presiding ALJ further contrasted the language of the type I clauses with the language of the other types of area rate clauses as to which the Chief ALJ dismissed the third-party protests, concluding that the parties were contemplating, at least as to the type I clauses, an area rate for stripper well gas that the Commission would find to be just and reasonable at the conclusion of a proceeding.[22]

The presiding ALJ detailed his process of reasoning and conclusion in these words:

I have carefully considered the language of the involved clauses, the oral and written evidence of intent, and the evidence of course of performance of the parties. This language expresses the expectation of the parties that there would be some kind of Commission action in which the parties would have an opportunity to be heard. This expectation cannot be ignored. Their language does not contemplate the collection of Section 108 rates.

The extrinsic evidence of intent in the record does not warrant a different conclusion. The extrinsic evidence is, itself, ambiguous. Moreover, the interpretation of this evidence advanced by United and the producers is incompatible with the language of the contracts. In this event, I am forced to rely on the contract

---

**22.** The type I area rate clauses at issue provide: The term "Area Rate", as used herein, shall mean the applicable rate, including any applicable adjustments, determined by an order of the Federal Power Commission (or any successor regulatory body) in or growing out of the Other Southwest Area Rate Proceeding (AR67–1), or other proceedings, to be the just and reasonable rate generally and prospectively applicable to the gas produced from the area where the lands and leaseholds covered by this contract are located and which by virtue of such order is applicable to the sale of gas hereunder.

In contrast to the above type I clauses, the type II clauses, which do not refer to a rate proceeding to ascertain a just and reasonable rate, provide:

The term "Area Rate", as used herein, shall mean the applicable rate, including any applicable adjustments, determined as the result of any order, settlement or any other ruling of the Federal Power Commission (or any successor regulatory body) fixing the rate generally applicable to gas produced from the area where the lands and leaseholds covered by this contract are located.

language as the only reliable evidence of the parties' intent. As noted, that language supports the protestors. The protest is upheld with respect to the Type I clauses. I find that these clauses do not authorize collection of Section 108 rates. 20 F.E.R.C. at 61,226. The producers assert that the above language in the presiding ALJ's opinion indicates that he relied *exclusively* on the language of the contracts in reaching his determination that the parties did not intend to authorize the collection of the NGPA rate for stripper well gas. The producers argue that the presiding ALJ's approach therefore embodies the exact proposition condemned by this Court in *Pennzoil II* that the parties' averment of mutual intent may be negated by an incompatibility with the language of the area rate clause alone. We agree.

■ *Pennzoil II* requires that the Commission, in ascertaining the parties' intent, construe the language of the contracts, considering not only the language of the contracts, but all the extrinsic evidence of intent presented, including the parties' assertion of mutual intent. The Commission is not to disregard the contracting parties' assertion of mutual intent after the Order 23 presumption is dispelled.

In the instant case, the presiding ALJ concluded that the area rate clauses did not clearly contemplate the application of NGPA rates. The problem is that this contract construction became the be-all and end-all of his reasoning. Although he stated that he considered the extrinsic evidence of the parties' intent, including United's refusal to pay stripper well rates in the four month period between its April 23rd letter, its August retraction, and prior and subsequent payments of such NGPA rates, it is clear that he could not have done so

and at the same time given the contract language preclusive effect.

■ *Pennzoil II* requires that "*all* evidence"—contract language, oral and written extrinsic evidence and evidence of course of performance—be *balanced* to determine the parties' intent. 789 F.2d at 1141. *Pennzoil II* does not permit ambiguities or conflicts to negate consideration of any part of the overall picture. A proper application of *Pennzoil II* requires that *all* of the extrinsic evidence and contract language be weighed to determine the factual question of the parties' intent.

■ Both United and the producers started off agreeing that NGPA rates applied. United unilaterally decided to take the position that they did not. United stopped paying the rates and so advised the producers. The producers immediately protested and continued to protest until United changed its unilateral position. United thereupon resumed paying NGPA rates and continued to do so without fail. The action of one party to a contract who applies a different construction but then backs down when challenged, does not constitute mutual agreement. Such action does not create an ambiguous course of performance. Rather than giving this course-of-performance evidence equal weight with the contract language, the presiding ALJ labeled it "ambiguous" and ignored it.

By adopting this reasoning, the Commission clearly failed to comply with the mandate of *Pennzoil II*. This failure to acknowledge the controlling weight of this substantial evidence leaves this part of the Commission's order without support, and it must be vacated with regard to type I clauses.[23]

---

23. We are reluctant to differ with Judge Johnson, the author of *Pennzoil II*, about what that decision holds. We do so only because our view of its clear command controls the outcome in this appeal. First, we would observe what *Pennzoil II* did not do—it did not require the Commission on remand to reach that result reached by the ALJ. Footnote 44, to which Judge Johnson refers, commends the presiding ALJ's *"approach."* That approach was: "I have carefully considered the language of the involved clauses, the oral and written evidence of intent, and the evidence of course of performance of the parties." If footnote 44 had intended to command the Commission to adopt the ALJ's conclusion that all extrinsic evidence was to be rejected as "incompatible with the language of the contract," *Pennzoil II* should have directed the entry of an order accordingly instead of sending the proceedings back to the Commission for further consideration. The dissent should fault the ALJ's pen, not ours, for

## C. *Contract Modification*

■ The producers also asserted that the Commission failed to comply with this Court's directive in *Pennzoil II* that the Commission determine on remand whether the contracting parties effectively modified their contract to provide for the collection of section 108 rates for stripper well gas. Our agreement with this contention provides added support for our decision to vacate the Commission's order as to type I clauses.

In *Pennzoil II*, in response to the producers' assertion that United's August retraction letter constituted a contract modification, the Commission argued that the letter did not amount to a formal offer, nor was there a formal acceptance. *Pennzoil II*, 789 F.2d at 1144. The *Pennzoil II* Court rejected the above argument by the Commission, stating that "the UCC requires no 'formal' offer and acceptance for a contract modification to be effective as between the parties." *Id.* Additionally, the *Pennzoil II* Court stated that

> [I]f United began to pay stripper well rates after the August retraction letter and continued to do so, such conduct would most likely constitute an amendment or modification to a contract that otherwise would not permit recovery of those higher rates. Moreover, the retraction letter alone under some states' law might constitute a modification.

*Id.*

However, the *Pennzoil II* Court declined to address whether a contract modification occurred under the particular facts of the case, noting that the resolution of the contract modification issue encompassed two factual determinations better addressed by the Commission on remand. First, the Court noted the potential statute of frauds issue, framing the issue as "whether the August 1979 letter, alone or in combination with the existing written contract, meets [any writing] requirement under each applicable state's law." *Id.* at 1144 n. 43. The

second determination left to the Commission was the effect of United's course of conduct with individual producers.

On remand, the Commission concluded that the parties had not effectively modified their contract to provide for the collection of section 108 NGPA prices. The Commission focused primarily on the August retraction letter itself. Similar to its error in gauging the intent of the parties, the Commission failed to address, to any significant degree, whether the subsequent conduct of the parties in paying and collecting the NGPA rate for stripper well gas after the August letter constituted such a modification. The Commission reasoned that United sent the August letter in an attempt to maintain its relationship with the producers during a period of shortage of supply. To further support its decision to reject the contract modification, the Commission noted that United does not actively support the contract modification theory espoused by the producers in the instant case, and deduced from United's perceived lack of support that United must oppose contract modification.

We initially note that this part of the Commission's decision fails to address the language in *Pennzoil II* that "if United began to pay stripper well rates after the August retraction letter and continued to do so, such conduct would most likely constitute an amendment or modification." *Pennzoil II*, 789 F.2d at 1144. Additionally, we observe that an intent by United to maintain a good working relationship with its producers does not preclude a finding that the parties did in fact modify their contract to provide for the collection of NGPA rates for stripper well gas. Obviously, United could possess many motives for modifying its contract with its producers. One could certainly be to maintain better relations with its producers. Finally, United's failure to acquiesce in the producers' contract modification argument before the Commission, is not persuasive. Silence by United does not equal opposition

---

sweeping too broadly. Second, *Pennzoil II* held that the Commission had erroneously failed to take into account "the language of the contracts, and *all* the extrinsic evidence of intent present-

ed, including the parties' assertion of mutual intent." 789 F.2d at 1141 (emphasis in original). That is all we do here.

to the producers' position. Such silence may reasonably evince United's agreement with the position of the producers. All we can know is that United did not actively oppose that position before the Commission or before this Court. To the extent that the Commission relied on these bases in rejecting the contract modification theory, the Commission erred.

As to whether the actions of the parties complied with the various writing requirements of the states involved, we turn first to an analysis of Louisiana law in this area which is unique in that the state has not adopted the Uniform Commercial Code. Under Louisiana law, "[a]ll sales of immovable property shall be made by authentic act or under private signature." La.Civ. Code art. 2440 (West 1952 & 1988 Supp.). Research does not reveal a Louisiana case addressing the issue of whether the sale of natural gas, after the gas is removed from the wellhead, is an "immovable" within the context of the authentic act writing requirement. However, the Louisiana Supreme Court has concluded that, at least in a venue context, the sale of natural gas after that gas leaves the wellhead is a sale of a "movable." *Hawthorne Oil & Gas Corp. v. Continental Oil*, 377 So.2d 285, 287 (La.1979). Thus, it would appear that the Louisiana "authentic act" writing requirements are not implicated in sales of natural gas after the gas leaves the wellhead, but instead are confined to the sale and conveyance of oil, gas, and mineral interests which are united with the realty. *See* La.Civ.Code art. 470 (West 1980 & 1988 Supp.); *Texaco v. Newton and Rosa Smith Charitable Trust*, 471 So.2d 877 (La.App. 2d Cir.1985); *Guy Scroggins, Inc. v. Emerald Exploration*, 401 So.2d 680 (La.App.3d Cir.1981).[24] Since a writing is not required under Louisiana law for a modification of the contracts at issue in the instant case, the relevant inquiry now becomes whether

any contract modification by the parties complied with the provisions of La.Civ.Code art. 1846 (West 1987 & 1988 Supp.) which sets forth the standards for proving a contract not reduced to written form.

Article 1846 provides that "[i]f the price or value [of a contract] is in excess of $500, the contract must be proved by at least one witness and other corroborating circumstances." Addressing the statutory requirements of article 1846, the Commission stated that, "where, as here, the Commission finds the corroborating evidence insufficient, the August 24 letter would not, of itself, operate as a contract modification." Order on Rehearing, 40 F.E.R.C. at 61,182. Initially, we note that when the Commission speaks of the insufficiency of the corroborating evidence related to the issue of the intent of United and the producers to collect stripper well prices under the NGPA it speaks as of the time the contract was originally executed. In contrast, the issue to be resolved by the Commission regarding the compliance of the contracting parties with article 1846 is whether the corroborating evidence is sufficient to establish the parties' intent to modify their contract at the time the asserted modification occurred. The Commission's focus on the nature of the corroborating evidence of the parties' intent at the time of the contract's execution rather than at the time of the contract's modification was error.

Moreover, ample corroborating evidence was presented to the Commission to support the parties' argument that a contract modification occurred. Such evidence consisted of the August retraction letter; testimony by Mr. Aubin, United's contract negotiator, to the effect that United's intent was to pay the higher NGPA rate for the stripper well gas; and testimony by the producers of their intent to collect NGPA rates.[25] Finally, the most compelling cor-

---

**24.** Our conclusion that the sale of natural gas, once leaving the wellhead, constitutes the sale of a "movable" is consistent with the Louisiana rule that the sale of standing timber is an "immovable," while the sale of timber which has been severed from the ground is classified as a "movable." *See Gillespie v. W.A. Ransom Lum-*

*ber Co.*, 234 F.2d 285 (5th Cir.1956); *Conques v. Coleman*, 315 So.2d 805 (La.App. 3d Cir.1975).

**25.** We note that a party to a lawsuit may serve as his own "credible witness" for the purposes of proving a contract within the context of article 1846. *Feazel v. Feazel*, 471 So.2d 851 (La.

roborating evidence of the contract modification is the parties' consistent, unbroken performance subsequent to the August retraction letter in paying and receiving and retaining the higher NGPA rate for the stripper well gas. Louisiana law specifically recognizes the partial performance of a contract as sufficient corroborating evidence for the purposes of article 1846. *Bushnell v. Chaumont*, 498 So.2d 1170 (La.App.3d Cir.1986); *Anderson v. Namias*, 477 So.2d 907 (La.App. 4th Cir.1985).

The standard this Court is to utilize in reviewing the Commission's determination regarding the sufficiency of the corroborating evidence for purposes of article 1846 in a FERC setting is unclear. Under traditional concepts of Louisiana contract law, the existence of corroborating circumstances and a credible witness, to prove a contract in excess of $500 is a question of fact. A trial court's findings on this issue are entitled to great weight and are not reversed unless clearly erroneous. *See Higgins v. Smith International, Inc.*, 716 F.2d 278 (5th Cir.1983); *Strecker v. Credico Financial, Inc.*, 444 So.2d 783 (La.App. 4th Cir.1984). However, as noted by this Court in *Pennzoil II*, the factual determinations of the Commission in ascertaining the parties' intent are reviewed under the substantial evidence test. *Pennzoil II*, 789 F.2d at 1135. Without addressing which standard of review is appropriate in the instant setting, we are persuaded that the Commission's conclusion that the corroborating evidence in the instant case is insufficient to satisfy the Louisiana requirements of article 1846 fails under either the substantial evidence or the clearly erroneous standard.

Addressing Texas and Mississippi law next, we note that both states have adopted the provisions of the U.C.C. and mandate essentially identical writing requirements for contracts. Specifically, both states require that a contract for the sale of goods for the price of $500 or more be in writing and signed by the party against whom enforcement of the contract is sought. *See* Miss.Code Ann. § 75–2–201 (1972 & 1987 Supp.); Tex.Bus. & Com.Code Ann. § 2.201 (Vernon 1968 & 1988 Supp.).[26] On remand from *Pennzoil II*, the Commission concluded that the parties' attempt at a contract modification did not comply with the statute of frauds provisions under Texas and Mississippi law, stating that the August retraction letter did not satisfy the U.C.C. § 2–201 criteria because the August letter failed to state a quantity term. Additionally, the Commission based its conclusion that the statute of frauds was not satisfied on the fact that United and the producers did not undertake to amend or modify their contract with the traditional formalities surrounding amendments to contracts in the industry. For two reasons, the Commission erred in concluding that the statutes of frauds for Texas and Mississippi were not satisfied in the instant case.

First, in concluding that the August 24 retraction letter failed to specify a quantity term, the Commission rejected the producers' contention that the reference in the August letter to the existing contracts between United and the producers was sufficient to establish quantity terms in the existing contracts so as to comply with

---

App.2d Cir.1985); *Hurston v. Hurston,* 417 So.2d 407 (La.App. 1st Cir.1982).

**26.** Section 2–201 of the U.C.C. on sales in its entirety, and as adopted by both Texas and Mississippi, states:

(a) Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term

agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

. . . . .

(c) A contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable ...

. . . . .

(3) with respect to goods for which payment has been made and accepted or which have been received and accepted.

U.C.C. § 2–209(3) requires that the parties comply with the statute of frauds provision, U.C.C. § 2–201, if the contract as modified falls within its provisions.

section 2–201. The August 24 notice to sellers from United stated:

> Under "Notice to Sellers" dated April 23, 1979, you were advised, **inter alia,** that it was United's view that the wording of the typical area rate clause contained in its gas purchase contracts authorizes the collection of the applicable Natural Gas Policy Act (NGPA) rates except for Section 108—Ceiling Price For Stripper Well Natural Gas. The last paragraph of said "Notice" dealt with United's interpretation of area rate clauses as they related to Section 108 of the NGPA. Since that time, United has reviewed its position in regard to the Section 108 rate and now concludes that, unless otherwise provided in the contract, *its typical area rate clauses do provide the contractual authority for United to pay and for sellers to receive the Section 108 rate under existing contracts,* assuming the seller has complied with the filing requirements of the Commission's Interim Regulations.

(emphasis added).

A "writing" for purposes of the statute of frauds may consist of separate writings, connected together by express reference to each other or internal evidence of their unity, relation, or connection; by so connecting the writings, otherwise separate documents may incorporate by reference the terms of each document. *See Affiliated Investments, Inc. v. Turner,* 337 So. 2d 1263 (Miss.1976); *Ludke Electric Co. v. Vicksburg Towing Co.,* 240 Miss. 495, 127 So.2d 851 (1961); *Central Power and Light Co. v. Del Mar Conservation District,* 594 S.W.2d 782 (Tex.Civ.App.—San Antonio 1980, writ ref'd n.r.e.). As is readily apparent, the August letter does in fact expressly refer to the existing contracts between United and the producers.

Moreover, assuming arguendo that the August 24 retraction letter did not incorporate by reference the provisions of the original contracts between the parties, including the quantity terms therein, the statutes of frauds for Texas and Mississippi may still be satisfied in the instant case due to the parties' performance in consistently charging and paying the higher NGPA rates subsequent to the August 24 letter. Section 2–201(3)(c) specifically provides:

> (3) A contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable
>
> . . . . .
>
> (c) with respect to goods for which payment has been made and accepted or which have been received and accepted.

In its opinion on remand, the Commission erroneously failed to consider the parties' conduct in modifying their contract under section 2–201(3)(c). Under the laws of Louisiana, Texas and Mississippi, the parties' conduct did constitute an effective contract modification.

### D. Individual Contentions of the Parties

In *Pennzoil II,* this Court stated that

> Several producers submitted individual briefs to this Court detailing evidence of a course of performance or course of dealing between United and that specific producer on which that producer is entitled to rely in attempting to establish its claim that its contract authorizes collection of stripper well rates. In addition, individual producers assert that certain actions by United amounted to a modification of their contract with United. The Commission has inadequately addressed these individual contentions.

*Pennzoil II,* 789 F.2d at 1145. In responding to the Court's directive to address the contentions of the individual producers on remand, the Commission rejected those contentions in conclusory fashion failing to set forth with any specificity its reasons for rejecting the arguments of the individual producers. In the instant appeal, several producers have again filed supplemental briefs asserting that the Commission erred by failing to consider the individual contentions of the producers in deciding whether the parties authorized the collection of section 108 NGPA rates.

For instance, the Cotton Valley producers, consisting of Amoco Production Company, Arco Oil and Gas Company, Hunt Oil Company, and Marathon Oil Company, as-

sert that evidence was introduced before the presiding ALJ indicating that the Cotton Valley producers did not enter into a contractual arrangement with United involving stripper well gas until November 1979, well after United had evidenced its intent to collect section 108 prices in the August 24 retraction letter. The Commission made no mention of this compelling evidence on remand. Additionally, in a supplemental letter brief submitted to this Court, producer Pennzoil Company describes testimonial and documentary evidence which Pennzoil argues is unique to the Pennzoil-United contracts and supports a finding by the Commission that Pennzoil and United intended to authorize the collection of section 108 NGPA rates for stripper well gas. The Commission's generic rejection of the individual producers' contentions failed to provide this Court with an adequate basis for appellate review. However, our resolution of the intent and modification issues above renders this issue moot.

## III. CONCLUSION

In sum, the Commission was not barred on the basis of collateral estoppel from concluding that United and its producers did not contractually authorize the collection of the higher section 108 NGPA rates for stripper well gas; in deciding the issue of the parties' intent regarding payment and collection of section 108 rates, the presiding ALJ improperly weighed the contracting parties' assertion of mutual intent, the contractual language of the clauses, extrinsic evidence of intent offered by the producers and protestors, and the regulatory atmosphere surrounding the execution of the contracts, and the Commission erred in accepting his analysis; and the Commission failed to properly apply state law regarding the issue of contract modification.

For these reasons, the petitions for review are GRANTED. The opinions and orders of the Commission are VACATED and the Commission is directed to enter a final order on type I clauses consistent with this opinion.

JOHNSON, Circuit Judge, dissenting:

I respectfully dissent from that portion of the majority's opinion which concludes that the presiding ALJ, and hence the Commission, erred by failing to give the proper evidentiary weight to the contracting parties' assertion of mutual intent and course of performance evidence in ascertaining the parties' true intent as to the collection of NGPA rates for stripper well gas. Pursuant to this Court's previous opinion in *Pennzoil II*, the Commission, in determining the contracting parties' intent to collect NGPA rates, is to weigh in its analysis the language of the contracts and all of the extrinsic evidence of intent presented including the parties' assertion of mutual intent. *Pennzoil II*, 789 F.2d at 1141. In the instant case, the majority concludes that the presiding ALJ departed from this Court's mandate in *Pennzoil II* as set forth above by allowing his construction of the contract language to become the "be-all and end-all" of his intent analysis, thereby effectively ignoring the other extrinsic evidence of intent offered by the parties. The majority's conclusion, however, is misperceived.

In the instant case, the presiding ALJ did not refuse to consider the contracting parties' assertion of mutual intent as evidence of that intent; in fact, the presiding ALJ expressly stated that the extrinsic evidence of intent offered by both parties was considered when making his decision. Only after making credibility determinations and considering all of the evidence presented did the presiding ALJ then determine that the only *reliable* evidence, *not* the *only* evidence, of the parties' intent was the contract language due to the ambiguous nature of the extrinsic evidence of intent offered by the parties. Therefore, relying on the language of the contract, the presiding ALJ determined that the parties did not intend to collect NGPA rates for stripper well gas.

In *Pennzoil II*, this Court, by requiring the Commission to consider extrinsic evidence of intent in ascertaining the parties' true intent as to the collection of NGPA rates, did not envision the concomitant of

that requirement to be that the Commission accept the veracity of that extrinsic evidence. The majority's opinion today effectively imposes such a stringent and wholly unwarranted requirement on the Commission. As a result, the Commission is stripped of the discretion which it must enjoy to give greater weight in its intent analysis to certain evidence over other evidence based on the credibility and reliability of that evidence. Certainly, the Commission is never at liberty to fail to consider any evidence offered by the parties of their true intent regarding NGPA rates; however, after receiving the evidence offered, the Commission must be permitted to discount that evidence, if it so determines, as lacking reliability or credibility. Such is the very nature of a factual determination.

In the instant case, the presiding ALJ considered all of the evidence of intent, deemed some of that evidence unreliable, and only then rendered a conclusion as to the intent of the parties to collect NGPA rates for stripper well gas. This Court does not reverse such a factual determination unless that determination is not supported by substantial evidence. *Pennzoil II*, 789 F.2d at 1135. While the majority may view the facts as supporting a different conclusion on the intent issue than that reached by the presiding ALJ, the fact remains that sufficient evidence existed in the form of United's actions in disavowing its intent to collect NGPA rates to support the presiding ALJ's decision to discount the parties' assertion of mutual intent as unreliable. Thus, constrained to rely on the contract language, the presiding ALJ then concluded that the parties did not intend to collect NGPA rates for stripper well gas. On the above facts, the presiding ALJ's decision was supported by substantial evidence.

Finally and ironically, this Court has previously found the presiding ALJ's approach to the intent inquiry to be "emminently reasonable and practical and [one] which might serve as a model [to the Commission] on remand." *Pennzoil II*, 789 F.2d at 1145 n. 44. In this vein, the previous panel characterized the presiding ALJ's approach

as the type of approach contemplated by this Court in *Pennzoil I* since that approach construes the language of the contracts in light of the extrinsic evidence. *Id.* at 1141. It is inexplicable how an approach previously extolled by this Court is able to become one fraught with error simply by the sweep of a pen. For all of the above reasons, I dissent from that portion of the majority's opinion finding fault with the presiding ALJ's analysis of the parties' intent.